IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MNW, LLC, AN INDIANA LIMITED LIABILITY COMPANY, | ) ) ) | |
| PLAINTIFF, | ) ) | |
| VS. | ) ) | NO. 1:08-CV-119 |
| MEGA AUTO GROUP, INC., A NEW YORK CORPORATION; PERFECT AUTO SALES, INC., A NEW YORK CORPORATION; MARK SHULMAN; FLASH AUTO GROUP, INC., A NEW YORK CORPORATION; AND VIP MOTOR GROUP, LLC, A NEW YORK LIMITED LIABILITY COMPANY, | ) ) ) ) ) ) ) ) ) ) | |
| DEFENDANT. | ) ) | |
| ********** | ) ) | |
| PERFECT AUTO SALES, INC., A NEW YORK CORPORATION, | ) ) ) | |
| CROSS-CLAIMANT, | ) ) | |
| VS. | ) ) | |
| MEGA AUTO GROUP, INC., A NEW YORK CORPORATION; MARK SHULMAN; FLASH AUTO GROUP, INC., A NEW YORK CORPORATION; AND VIP MOTOR GROUP, LLC, A NEW YORK LIMITED LIABILITY COMPANY, | ) ) ) ) ) ) ) | |
| CROSS DEFENDANTS. | ) | |

OPINION AND ORDER

This matter is before the Court on: (1) MNW, LLC's Motion for
Summary Judgment, filed on December 15, 2009 [DE 85]; (2) Defendant
Flash Auto Group, Inc.'s Cross Motion for Summary Judgment and

Response to MNW, LLC's Motion for Summary Judgment, filed on January 15, 2010 [DE 91]; (3) VIP's cross-motion for summary judgement, which was not filed separately, but as referenced in "Mega Auto Group, Inc.'s and VIP Motor Group, LLC's Brief in Opposition to MNW, LLC's Motion for Summary Judgment and in support of VIP Motor Group, LLC's Cross Motion for Summary Judgment", filed on January 15, 2010 [DE 90]; (4) MNW, LLC's Motion to Strike Inadmissible Evidence Submitted by Defendant, Flash Auto Group, Inc., in Opposition to MNW, LLC's Motion for Summary Judgment and In Support of its Cross Motion for Summary Judgment, filed on February 1, 2010 [DE 97]; and (5) MNW, LLC's Motion to Strike Inadmissible Evidence Submitted by Mega Auto Group, Inc. and VIP Motor Group, LLC in Opposition to MNW, LLC's Motion for Summary Judgment and in Support of VIP Motor Group, LLC's Cross Motion for Summary Judgment, filed on February 1, 2010 [DE 99].

For the reasons set forth below, MNW, LLC's motion for summary judgment [DE 85], Flash Auto Group, Inc.'s cross-motion for summary judgment [DE 90], and VIP's cross-motion for summary judgment [DE 91] are **DENIED** in all respects except that summary judgment is **GRANTED IN FAVOR OF MNW, LLC** on Flash Auto Group, Inc.'s claim for specific performance and Mega's Auto Group, Inc.'s counterclaim for conversion. MNW, LLC's motions to strike inadmissible evidence [DE 97 and 99] are **DENIED.**

BACKGROUND

MNW's Amended Complaint for Damages and for Declaratory Judgment sets forth two counts. In Count I, MNW seeks damages from Mega Auto Group, Inc. ("Mega"), Perfect Auto Sales, Inc. ("Perfect"), and Mark Shulman ("Shulman") for breach of contract and damages resulting from misrepresentations by Mega, and/or Shulman. In Count II, MNW asks this Court to determine the rights and obligations of Flash Auto Group, Inc. ("Flash") and VIP Motor Group, LLC ("VIP") under the purchase agreements and/or the Indemnification Agreement and for all other just and proper relief.

Perfect was represented by counsel, and while so represented, filed a cross-claim alleging that, if held liable, Perfect is entitled to indemnification or contribution from its co-defendants. Thereafter, Perfect's counsel withdrew and Perfect declined to obtain new counsel. As a result, this Court entered default against Perfect upon MNW's motion for entry of default. Perfect's cross-claim, however, has not been resolved. Despite discussion of the filing of a motion to dismiss for failure to prosecute at the status conference on October 22, 2009, no such motion has been filed.

Shulman was never successfully served, and although the facts of this case center around his actions, he has not participated in the litigation.

The other three Defendants, VIP, Flash, and Mega, have all filed counterclaims. Flash claims that it wired $135,710.00 to MNW as payment for two vehicles, and MNW has refused to either return the funds or deliver the vehicles. Flash's counterclaims are for conversion and criminal conversion, specific performance, and breach of contract.

Mega's counterclaim alleges that in mid-April 2008, Mega was in the process of purchasing three automobiles from MNW, that VIP was acting as the broker for Mega, that Mega would be the ultimate purchaser of those vehicles, and that Mega provided the funds to purchase the vehicles. Mega further asserts that "MNW has in its bank account the funds wired by VIP on behalf of Mega Auto on April 14, April 15, and April 17, 2008, for the purchase of the three (3) Mercedes Benz vehicles" and "MNW refuses to complete the sale and/or refund the monies to VIP or Mega Auto." Mega asks for judgment in the amount of $150,905.00, plus pre-judgment interest, costs and other expenses for its claim for return of funds. Mega also claims conversion, and seeks treble damages, costs, attorneys fees, and other reasonable costs pursuant to I.C. section 34-24-3-1.

VIP alleges that it too transferred $150,905.00 of its money to MNW for the purchase of three (3) Mercedes Benz vehicles that MNW refuses to deliver, and that MNW also refuses to refund the

monies. Like Mega, VIP asserts a claim for return of funds and also for conversion.

MNW seeks summary judgment on both its breach of contract claim against Mega and Perfect and its declaratory judgment action against VIP and Flash. MNW also seeks summary judgment on the Defendants' counterclaims for conversion, and Flash's counterclaim for breach of contract. Flash argues that MNW's motion for summary judgment should be denied to the extent that MNW seeks judgment on MNW's claims against Flash because genuine issues of material fact preclude the entry of summary judgment. With regards to the counterclaims, Flash filed a cross motion for summary judgment, and asserts that summary judgment is appropriate, but in Flash's favor. Additionally, VIP and Mega seek summary judgment on MNW's claims against them, and VIP also seeks summary judgment on its counterclaims. The instant motions are now fully briefed and ripe for adjudication.


DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corporation.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant.  *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991). *See also* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant.  *Anderson*, 477 U.S. at 255; *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).  "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'"  *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original). *See also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002).

Motions to Strike

MNW has filed two motions to strike inadmissible evidence submitted by the Defendants. In those motions, MNW argues that the Defendants have relied upon information that is not supported by the record, and also on inadmissible hearsay statements.

In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial. *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). This

Court is able to sift through the evidence and to consider each piece under the applicable federal rules. Indeed, it is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement. *See e.g., SEC v. KPMG LLP,* 412 F.Supp.2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.,* No. 04 C 5167, 05 C 2253, 2006 WL 980740, *2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Copr.,* No. 03C2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor,* 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004). Thus, there is no need to strike any portion of the Defendants' evidence. Although this Court **DENIES** MNW's motions to strike as unnecessary, this Court will take into consideration the challenges to the admissibility of certain evidence.

Facts

The Parties

MNW is an authorized Mercedes-Benz dealership located in Fort Wayne, Indiana. On or about November 7, 2007, MNW purchased the Mercedes-Benz dealership from its predecessor, Shaver Imports. Paul Webb ("Webb") is co-owner and General Manager of MNW.

Mark Shulman, also known as Alex Shulman ("Shulman"), is a citizen of New York. Shulman negotiated the purchase of numerous Mercedes-Benz vehicles from MNW during the period of November, 2007 to April 13, 2008.[1]

Perfect was a licensed motor vehicle dealer and retained an office in Brooklyn, New York.

Mega was a licensed wholesaler of vehicles with an office in Newark, Delaware. Mega's president is Igor Oransky ("Oransky"). Oransky has been unable to fully participate in this litigation due to a serious illness.

Flash also was in the business of wholesaling and retailing vehicles. Flash, however, operated without a license. Michael Lykov ("Lykov") is Flash's business manager, and Constantine Pshenichniy ("Pshenichniy") is the sole member of Flash. Flash's office is located in Brooklyn, New York.

---

[1]MNW asserts that it sold 71 vehicles to Shulman during this period. Mega, however, claims that MNW produced documentation during discovery as to only 37 vehicles. Mega relies upon "MNW, LLC's Responses to Mega Auto Group, Inc. and VIP Motor Group, LLC's Request for Production of Documents" to support its assertion that MNW produced, and therefore possesses, agreements as to only 37 vehicular sales. A review of the requests for production tendered by Mega and VIP shows that Mega and VIP did not ask for all such agreements. Accordingly, Mega and VIP can not now assert that the failure to produce all 71 purchase agreements indicates the agreements do not exist. Additionally, the precise number is not material to the resolution of the instant motions.

VIP was a licensed wholesaler of automobiles beginning in February 2008. Alex Kart ("Kart") is a member of the limited liability company. VIP is also located in Brooklyn, New York.

## Mercedes-Benz' Prohibition on Exporting Vehicles

As an authorized Mercedes-Benz dealer, MNW is permitted to sell new motor vehicles to customers residing in the United States and its territories. Mercedes-Benz USA ("MBUSA") had a policy at the time relevant to this suit governing the exportation of its vehicles. MNW was and is subject to the policy, which prohibits the sale of Mercedes-Benz vehicles outside of the United States and its territories. Failure to comply can result in disciplinary action and discharge.

In 2007, MBUSA's Vehicle Export Policy (applicable to passenger cars and light trucks) provided for an extraterritorial service commission charge plus a $250 administration fee to be assessed against a dealer who sold a Mercedes-Benz vehicle that was subsequently exported outside the United States or its territories and was identified by Daimler Chrysler AG's ("DCAG") foreign dealer network as an export within twenty-four months of the vehicle's retail date. The 2007 policy was as follows:

> For any Passenger Car [or Light Truck] identified by DCAG as an export within twenty four months of the retail date and for which MBUSA received a DCAG extraterritorial service charge, the Dealer will incur an extraterritorial service commission charge

> plus a $250 administration fee regardless of
> whether the 2% Export Threshold Allowance has
> been met or exceeded. In addition the
> Passenger Car [or Light Truck] will be counted
> as an export and added to the monthly
> Export/Summary Report...

The extraterritorial service commission charge assessed against the dealer was equal to 5% of the foreign list price of the vehicle in the country to which the vehicle was exported.

Effective January 1, 2008, MBUSA's policy was revised, and the administrative fee increased to $300. Further, the policy provided for the assessment of a charge only if the vehicle is exported within one year of the original retail date. The 2008 policy provides:

> If a vehicle is identified by a Mercedes-
> Benz foreign dealer network and it is
> determined the vehicle was exported within one
> year of the original retail date, MBUSA will
> be assessed an Extraterritoral Commission
> (approximately equal to 5% of the foreign list
> price) by Daimler AG, MBUSA will in turn pass
> this monetary charge through to the
> appropriate dealer and assess a $400
> administration fee increased (effective April
> 1, 2008). These charges apply to every unit
> for which the charge has been assessed to
> MBUSA and are not subject to the 2% Export
> Allowance Threshold. Be advised it can take
> up to 24 months for MBUSA to be notified of
> these charges.

To enforce its export prohibition, MBUSA monitors the ports of embarkation for Mercedes-Benz vehicles leaving the United States and notes the vehicle identification number ("VIN") for every vehicle exported. The VIN is used to identify the dealership that

sold the vehicle and against whom an extraterritorial charge is assessed upon the vehicle presenting at a Mercedes-Benz dealership in the foreign country. In addition to the financial charges assessed against a dealership, dealers are also subject to a chargeback against their inventory allocated by MBUSA to account for vehicles exported. This negatively impacts a dealer's inventory by reducing the number of vehicles MBUSA allocates to the dealer for sale.

Pursuant to its dealership agreement with MBUSA, MNW may sell Mercedes-Benz vehicles to another dealer who is licensed. These transactions are tax exempt and no state sales tax is collected at the time of purchase for sales between MNW and a licensed dealer from another state. In order for MNW to sell a vehicle to another dealer without charging sales tax, the dealer must present a license. It is MNW's business practice to request a dealer license and taxpayer identification number in order to sell a vehicle to a dealer or wholesaler.


The Sales Resulting in this Litigation

From November, 2007, to April 14, 2008, Shulman purchased 71[2] vehicles using Mega or Perfect's license. At all times, Webb believed Shulman was purchasing the vehicles on behalf of another

_____

[2]As noted previously, although there is some dispute regarding the number of vehicles at issue, that number is not material to the outcome of the instant motions.

licensed dealer and that the vehicles would be resold for use in the United States. Shulman was the sole negotiator for the purchase of all the vehicles. Webb believed that Shulman had authority to purchase the vehicles on behalf of the dealer whose license he provided MNW. Once a price had been negotiated, MNW's internal computer system would generate an internal transaction report which was sent to Shulman evidencing the purchase price, VIN and amount owed on the car prior to the vehicle being contracted through Finance. MNW would not release a vehicle for transport until MNW confirmed that the purchase funds had been wired to its account. Shulman executed purchase agreements either in person or via overnight mail.

<u>Perfect</u>

In July, 2007, Shulman contacted MNW's predecessor, Shaver Imports, to purchase two (2) Mercedes-Benz vehicles. Shulman informed Shaun Ivancic ("Ivancic"), Shaver's salesman, that he was purchasing vehicles for Elite Motor Group ("Elite"). Ivancic discussed Mercedes-Benz' prohibition on exporting vehicles with Shulman. Shulman informed Ivancic that the vehicles were not for export but were to be sold for use in the United States. Shulman also agreed to sign Shaver's export policy. Shulman provided Shaver with Elite's federal tax identification number ("TIF").

In early November, 2007, Shulman contacted MNW to purchase additional Mercedes-Benz vehicles. Shulman informed Ivancic, who was now a salesman with MNW, that he no longer worked for Elite but now worked for Perfect and was purchasing the vehicles on behalf of Perfect. Shulman provided MNW with Perfect's dealer license number and TIF. Shulman again represented to Ivancic that the vehicles would not be exported, and again executed the Acknowledgment of Export Policy.

From November 7, 2007, through April 14, 2008, Shulman purchased numerous vehicles from MNW using Perfect's (and later Mega's) dealer license and TIFs. In each instance, a purchase agreement was prepared. MNW contends that Shulman affirmatively represented and warranted that the vehicles being purchased were intended for use within North America and would not be exported, directly or indirectly. MNW further asserts that Shulman agreed to the terms of MNW's "Acknowledgement of Export Policy" which states:

> MERCEDES-BENZ OF FORT WAYNE, AS AN AUTHORIZED
> MERCEDES-BENZ DEALER IS SOLELY PERMITTED TO DISTRIBUTE
> MERCEDES-BENZ VEHICLES WITHIN MBNA'S EXCLUSIVE SALES
> TERRITORY (NORTH AMERICA). IN THE EVENT THAT A
> MERCEDES-BENZ VEHICLE, WHICH IS SOLD BY MERCEDES-BENZ OF
> FORT WAYNE, IS EXPORTED FROM THE PERMITTED SALES TERITORY
> [SIC], MBNA ASSESSES CHARGES AND OTHER RELATED COSTS
> AGAINST THE DEALER WHICH SOLD OR LEASED THAT VEHICLE. AS
> SUCH, MERCEDES-BENZ OF FORT WAYNE, AS AN AUTHORIZED
> DEALER REQUIRES THAT A PURCHASER OR LESSEE OF A NEW
> MERCEDES-BENZ VEHICLE AFFIRMATIVELY WARRANT AND REPRESENT
> IN WRITING THAT THE VEHICLES BEING PURHCASED [SIC] OR
> LEASED ARE INTENDED FOR USE WITHIN THE AFOREMENTIONED
> SALES TERRITORY AND THAT THE VEHICLES WILL NOT BE EXPORTED
> DIRECTLY OR INDIRECTLY FROM THE SALES TERRITORY . . . . . . .

EXECUTION OF THE PURCHASE/LEASE DOCUMENTS BY THE
PURCHASER/LESSEE SHALL CONSTITUTE ACCEPTANCE OF THESE
TERMS AND CONSTITUTE ACCEPTANCE OF THE TERMS AND
CONDITIONS AGREEMENT THERETO.

(DE 87-2 at 50).

In early 2008, Webb began assisting Ivancic with Shulman in order to allow Ivancic to serve other customers as Shulman was monopolizing a significant portion of Ivancic's time. Webb was in contact with Shulman every couple days, as Shulman sought to purchase additional vehicles. Shulman informed Webb that he worked for Perfect. Webb admits that Shulman never gave him a letter from Perfect confirming that Shulman was Perfect's employee. Shulman repeatedly represented to Webb, in person and over the phone, that the vehicles he was purchasing were not to be exported. Webb explained MBUSA's policy against exporting vehicles to Shulman, including the potential charges that would be incurred if the vehicles were exported in violation of the policy. Shulman represented and warranted to Webb that the vehicles were not being purchased for export.

Mega

In the later part of March, 2008, Shulman informed MNW that he was now purchasing vehicles for Mega. Shulman presented MNW with Mega's dealer license, a letter from the IRS identifying Mega's employer identification number and an insurance identification card in Mega's name. The dealer license number provided to MNW is the

license Mega utilized from 2007 until the present. Mega's address appears on the dealer license, the letter from the IRS and the insurance identification card. Shulman represented he worked for Mega. Webb admits that Shulman never gave him a letter from Mega confirming that Shulman was its employee. Webb never saw any fax communication or electronic mail to Shulman from Mega's office or business location in New York. Webb never received a business card identifying Shulman as a representative of Mega. Webb never called Mega's home office to reach Shulman; rather, he contacted Shulman via Shulman's cell phone.

From March 26, 2008, through April 14, 2008, Shulman purchased numerous Mercedes-Benz vehicles from MNW using Mega's license. Mega admits in its amended counterclaim [DE 49] that it purchased vehicles from MNW in March, 2008, through April, 2008, through Shulman and/or VIP. Mega and VIP would split the profit after each transaction. Despite these concessions in the record, Mega now contends that it did not authorize Shulman to make a single one of the purchases that were completed; it only authorized Shulman to act on its behalf with regards to the three purchases where MNW held the funds and refused to deliver the vehicles. The only evidence that supports this is Mega's answers to interrogatories, which were allegedly answered by both Oransky and Vadin Shapiro ("Shapiro"), a manager, but were only signed by Shapiro. Even though MNW sought a Rule 30(b)(6) deposition with a representative

of Mega, MNW was advised that Oransky was too ill to be deposed, and that no other individual existed who could sit for a Rule 30(b)(6) deposition.

Flash

From approximately November of 2007 through April of 2008, Shulman located vehicles and negotiated the purchase of said vehicles for Flash. For each vehicle purchased, Flash paid Shulman an amount based upon a percentage of profit Flash obtained on the sale of the vehicle. As Flash did not trust Shulman with its money, Flash claims it would wire the money for the purchase of the vehicles to MNW.

Flash acknowledges that in order for a new car dealer to sell another dealer a tax exempt vehicle in a wholesale transaction, the purchaser must be a licensed wholesaler. Flash, however, did not have such a license. Despite this fact, Flash claims that during that period of time, Shulman contacted MNW regarding the purchase of vehicles for Flash. Shulman was introduced to Flash "as a guy who can, who has connections in the car world, can locate certain cars, quickly have them delivered, et cetera." (Lykov Dep., at 18-19; DE 93-2). Flash would instruct Shulman to locate a specific vehicle. Upon locating a vehicle from MNW, Flash claims that Shulman would send Flash a NetStar report detailing the vehicle's specifications and Flash would instruct Shulman whether to purchase

the vehicle. Shulman solely negotiated the purchase price for Flash, and provided Flash with the purchase order indicating the final price and instructions regarding payment. Flash, however, contends that Shulman was not authorized to sign the purchase agreement on behalf of Flash.

Flash admits that the purchase orders Shulman provided Flash from MNW were not in Flash's name but were in the name of Mega, Perfect or someone else. Despite the fact that the purchase agreements were not in Flash's name, Flash never contacted MNW to inform MNW that the name of the purchaser was incorrect and never contacted the identified purchaser.

Flash claims that these purchase agreements and the wire transfers produced in response to MNW's First Request for Production of Documents evidence contracts between the parties.

Flash concedes that it received the Manufacturer's Statement / Certificate of Origin ("MSO") for each vehicle purchased from MNW but, admittedly, none of the MSO's were assigned to Flash and Flash did not provide an odometer statement for the vehicles it purchased to any of the entities who purchased the vehicles from Flash.

Prior to being notified by Shulman in April, 2008, that MNW was not releasing two vehicles to him, neither Lykov nor Pshenichniy had any direct communication with MNW. All information regarding the purchase of vehicles from MNW was provided to Flash by Shulman.

Flash admits it was aware of MBUSA's non-export policy in 2007 and 2008 as it had previously dealt with at least one other Mercedes-Benz dealer who had refused to sell Flash vehicles for export in violation of the policy and Flash had a copy of the policy. Flash expressly informed the dealer in that instance that the vehicles it was purchasing were for export. Lykov testified that all Mercedes-Benz dealers have strict rules and regulations but it was his belief that "not everybody follows" the rules. (Lykov Dep., at 58; DE 93-3 at 8).

Despite being aware of the export prohibition, Flash admits that all twenty-three (23) of the vehicles it claims to have purchased from MNW were purchased for export and were in fact exported. At no time did Flash contact MNW directly to inform MNW that it was exporting vehicles or determine whether MNW was aware that Flash was exporting the vehicles.

MNW was unaware of Flash's existence until after April 18, 2008, when Lykov contacted MNW seeking the return of funds allegedly paid by Flash to MNW. Lykov testified as Flash's corporate designee that Flash has no relationship with VIP. However, in response to discovery requests, Flash produced copies of checks evidencing payments Flash made to VIP relating to the vehicles in this case. Despite Flash's assertion, there is *some* relationship between Flash and VIP, although the nature and scope of that relationship is not known to this Court at this time.

VIP

VIP began its business operation with Kart renting an office and obtaining a wholesaler's license. Kart looked for customers, checked the Internet and tried to find cars that customers were looking for. Kart testified that Shulman came to the VIP office, introduced himself and told Kart if he was interested in buying vehicles, that Shulman would get them for a commission. The commission was $500 a car on average. There was no written agreement between VIP and Shulman.

In 2008, Shulman presented Webb with a "VIP Motor Group" business card in his name. VIP admits that the business card is identical to that of Alex Kart, VIP's owner, the only difference being the name on the card and the cell phone number. VIP's address, telephone and fax numbers appear on both cards. The styles of the card including font and color are identical. However, Kart also testified that he had nothing to do with Shulman getting the business cards.

Webb testified that he faxed this VIP business card to Ryan Campbell, MNW's Controller, in April of 2008. Webb does not remember when or why he was given the card. Webb admits, however, there were no vehicle sales made directly to VIP. Other than this card, Webb has no other email, voice mails, phone messages, letters or anything from VIP. Webb was never contacted by anyone else allegedly associated with VIP.

VIP claims to have purchased its first vehicle from MNW on March 6, 2008. In total, VIP claims to have purchased twenty-one (21) vehicles from MNW between March 6, 2008 and April 11, 2008. VIP wired funds to MNW for the purchase of 21 vehicles from March 6, 2009 to April 11, 2008. VIP received a purchase agreement for each and every one of the twenty-one (21) vehicles it purchased from MNW prior to wiring any money for the purchase of the vehicle. None of the purchase agreements were in VIP's name. Despite recognizing that none of the purchase agreements identified VIP as the purchaser, VIP never contacted MNW to inform MNW that the purchase agreement should be with VIP. VIP claims, however, that Kart contacted Webb a few times to confirm receipt of the wire transfers and to make arrangements to pick up the vehicles. VIP also received the MSO's for each of the twenty-one (21) vehicles it claims to have purchased from MNW. None of the MSO's were made out to VIP. Rather, each of the MSO's was in the name of Perfect or Mega.

Shulman informed VIP that Mega had given him its wholesale license for Shulman to use to buy cars "if Mega ever needed" cars. Shulman further informed VIP that he had been buying cars from MNW under two licenses - Perfect and Mega - and "not to disrupt the flow of things" but to let Shulman buy the cars as he had been doing using Perfect and Mega's licenses.

VIP continued to pay Shulman a commission as late as October, 2008 and Kart discussed this lawsuit with Shulman sometime in 2009. MNW was never, until the relationship with Shulman ended, provided with notice from any person that Shulman was not authorized to purchased the referenced vehicles.

Kart testified that Shulman had frequent contact with Webb at the Mercedes-Benz of Fort Wayne dealership.

> He told me he knew the guy extremely well, personal friends. When he came to my office, he was always on the phone with Paul Webb. It looked like they were buddy-buddy. Then all of a sudden I wire $150,000, and I have no cars, and I have no money. The money has been stolen. I do not know if it was Paul Webb and Shulman together, whether it was Paul Webb alone. I have no idea. The fact is I have no money. I have no cars.

(Kart Dep., p 21; DE 87-4).

As to the three vehicles that were paid for but not delivered, Kart claims that Mega was using VIP as a broker to obtain these vehicles.


MNW's Use (or Lack Thereof) of its Acknowledgment of Export Policy Form

MNW asserts that it requires every purchaser, whether wholesale or retail, to execute an Acknowledgment of Export Policy comparable to that signed by Shulman. Mega and VIP allege that MNW does not require the Acknowledgment of Export Policy to be signed for every sale, and in support of that assertion they point

to MNW's responses to requests for production, which include 37 sales agreements and only five Acknowledgment of Export Policy forms. Furthermore, Mega and VIP would note that, of the five forms that were produced, one is unsigned, and all but one is undated and not witnessed.

MNW's contentions are based on Ryan Campbell's ("Campbell") affidavit. Campbell is MNW's comptroller. Although the discovery documents produced by MNW do not conclusively establish that Campbell's assertion is false, because the discovery request itself did not require the production of all Acknowledgment of Export Policy forms, a review of the ones that were produced suggests that there is reason to doubt the accuracy of Campbell's assertion. The problem with Mega and VIP's assertion, however, is that Mega and VIP did not specifically ask that all such forms in MNW's possession be produced. Although this Court cannot adopt the Defendants' claim that failure to produce an Acknowledgment of Export Policy form for each sale allows this Court to conclude that none exist other than the one's produced, neither can this Court review the discovery that was produced and accept as true Campbell's assertion that such a form was indeed signed for each sale that is the subject of this litigation. Accordingly, a question of fact exists as to whether an acknowledgment of export form was signed for each transaction at issue.

Exportation of Vehicles Purchased from MNW

On April 17, 2008, MNW learned for the first time that many vehicles Shulman had purchased had been exported in violation of the applicable Mercedes-Benz policies.  On April 17, 2008, Wade Messing ("Messing") sent an export notification with the report dated April 8, 2008, to Webb at MNW and wrote:

> In looking at the data the first question I have is who is Mark Shulman?  Of the 22 exports 19 were by him, cut him off immediately.  As noted in the export policy I sent out earlier this year there are heavy penalties for exporting and we need to get a handle on this as soon as possible.

(DE 93-6 at 20).[3]

In response to the email he received from Messing, Webb sent an email to McKibben, the majority owner of MNW, and Campbell. Webb wrote that:

> I should have known if the money was this easy it was too good to be true, sorry I got caught up in this shit and caused all the bullshit. But I will tell both of you that I will work my ass off to not lose any ground.

(DE 93-6 at 20).[4]

---

[3]MNW claims this statement is hearsay.  The statement, however, is not being offered for the truth of the matter, but for its effect on Webb.  Accordingly, it is considered by this Court.

[4]MNW seeks to strike this statement, claiming it is inadmissible hearsay.  Admissions of party-opponents, however, are not hearsay.  Fed. R. Evid. 801(2).  Accordingly, it is appropriate for this Court to consider the statement.

Upon being notified by Mercedes-Benz, Webb informed Shulman that vehicles they had purchased had been exported in violation of the parties' representations and agreement. Webb called Shulman and advised him that MNW would withhold further performance until its damages or losses had been determined. Webb assumes that this notification of Shulman also constituted notice to Perfect and Mega, although that is less than clear.

Indemnification Agreement

MNW also alleges that on April 17, 2008, but prior to being notified that vehicles were being exported, Perfect, Mega and Shulman entered into an Indemnification Agreement in favor of MNW. The agreement provides the following:

> From time to time Indemnitor purchases and has purchased new Mercedes-Benz passenger cars and light trucks from an Indemnitee (the "Mercedes-Benz Vehicles"). Indemnitees are subject to vehicle export policies imposed by Mercedes-Benz US and /or its affiliated entities, which restrict, prohibit and/or regulate the export of the Mercedes-Benz Vehicles outside of the United States (the "Mercedes-Benz Policy"). Indemnitee would not sell to Indemnitor any such Mercedes-Benz Vehicles if it was aware that Indemnitor either intended to or did in fact participate in any way in the export of such Mercedes-Benz Vehicles or violated the Mercedes-Benz Policy. Indemnitor has represented to Indemnitee that it does not, has not and will not participate in the export of any such Mercedes-Benz Vehicle or violation of the Mercedes-Benz Policy.

* * * * *

1.  Indemnity.  Indemnitor shall indemnify Indemnitee from and against any and all liability, charge, damage, loss, cost or expense, including, but not limited to, reasonable attorney fees, which any Indemnitee may suffer or incur as a result of export of a Mercedes-Benz Vehicle or the violation of the Mercedes-Benz Policy.  In addition, because the costs or damages which may be suffered by Indemnitees as a result of such export or violation may include the loss of quota vehicles by Indemnitee and may be difficult to quantify, Indemnitor shall pay to Indemnitees the agreed amount of $7,500 for each Mercedes-Benz Vehicle in respect of which any Indemnitor participates, directly or indirectly, in the export or each violation of the Mercedes-Benz Policy.  Any such obligation or liability of Indemnitor shall be due and payable from Indemnitors, jointly and severally, upon demand, and, to the extent not recovered by offset by Indemnitee at its sole election against sums or performance owing to any Indemnitor, shall be paid not later than 60 days after demand with interest at the rate equal to the published prime rate.

3.  Term.  The obligations of Indemnitor under this Agreement shall commence on the date of execution hereof in respect of all Mercedes-Benz Vehicle purchased at any time, whether in the past or future, from an Indemnitee, and shall continue in full force and effect for so long as any Indemnitee may be exposed to risk or loss under the Mercedes-Benz Indemnitor from any Indemnitee.

4.  Incorporation of Mercedes-Benz Policy.  Each of the terms and conditions of the Mercedes-Benz Policy are incorporated herein by reference.  Each Indemnitor will be deemed in breach of this Agreement in the event of any default or breach under the terms of the Export Policy resulting from the acts or omissions of an Indemnitor.  In the event of default, each Indemnitee shall have the right to enforce as to any Indemnitor all rights and obligations arising under the Export Policy,

> including but not limited to those relating to
> remedies, financial information, affirmative
> and negative covenants, representations and
> warranties, and other miscellaneous terms and
> conditions.
>
> 5. <u>Expenses.</u> Indemnitors will pay any legal,
> accounting, documentary, search and other
> fees, costs and expenses incurred by
> Indemnitees in the enforcement of rights under
> this Agreement. Payment shall be made
> promptly following receipt of any invoice for
> such fees, costs and expenses.

(Webb Aff, ¶ 8, Ex. E, DE 87-2 at 40). Webb and McKibben signed

for MNW. Shulman signed as President for Perfect and Mega.

Webb testified that the Indemnification Agreement "was in the

process of being written for some months." (Webb Dep. at 114; DE

89-6 at 14). McKibben and Webb were at the Mercedes-Benz

dealership when the document was signed. Webb acknowledged that at

the time he and McKibben signed the Agreement, he does not remember

if Shulman had signed it. Webb did not witness Shulman sign the

Agreement; rather, the Agreement was faxed to Shulman. Webb opined

that Mega and Perfect received notice of the Agreement because

Shulman worked for them, but that VIP did not receive any notice

because Shulman did not work for VIP. Neither VIP nor Flash are

mentioned in the Agreement.


<u>History of Payments Being Made by Entities Not Named in the
Purchase Agreement</u>

MNW had received multiple wire transfers from VIP for

purchases arranged by Shulman. Accordingly, Mega and VIP contend

that MNW, Webb and Campbell knew that VIP had been sending wire transfers to pay for the Shulman vehicles. (Citing Webb Dep. Ex. D at 1-49; Kart Dep. Ex. 6). They have not, however, pointed to any evidence of actual knowledge. The record suggests that MNW (perhaps because it saw some benefit in doing so) opted not to pay much attention to where the money came from. (Webb. Dep. at 121-22; DE 87-3).

## Funds Retained in Reliance on the Indemnification Agreement

Money was wired to MNW for the purchase of three Mercedes-Benz vehicles, the price of which was negotiated by Shulman, and MNW has retained that money. The decision to neither deliver the cars nor return the money was made by Webb, McKibben and Campbell in reliance on the Indemnification Agreement. As a result, Mega and VIP have each asserted a counterclaim against MNW seeking return of $150,905.00 which VIP allegedly wired to MNW on behalf of Mega for the purchase of these vehicles. Mega claims that it was "in the process of purchasing three (3) automobiles from MNW" and that "VIP provided the funds to purchase the vehicles," wiring the funds to MNW on three separate occasions. The corporate designee of VIP, Kart, testified that Mega did not wire VIP any money for the purchase of those three cars. Although it is uncontested that the funds originated with VIP, Mega has nonetheless asserted a counterclaim seeking return of these funds.

Flash also asserts a counterclaim relating to its attempted purchase of two additional Mercedes vehicles. Flash seeks specific performance; namely, delivery of the two vehicles. MNW does not have possession of the Mercedes-Benz vehicles that Flash alleges in interest in, as they have been sold to unrelated third parties.

After MNW refused to complete these last five transactions, Shulman traveled to Fort Wayne and confronted Webb about MNW's failure to deliver the cars and decision to retain the funds wired for those cars. Webb said to Shulman, "I don't know who I'm dealing with, either. The only one I've ever dealt with is you."

Status of Export of Vehicles Purchased Through Shulman

At the time that MNW's instant summary judgment motion was filed, MNW was aware that forty one (41) of the vehicles purchased by Shulman from MNW had been exported. Flash has identified nine (9) other vehicles that it admits have been exported. At the time that MNW's summary judgment motion was filed, MNW had been charged an extra territorial commission and administrative fee on ten (10) vehicles that were exported. MNW has paid MBUSA $65,650.28 as a result of these exports. MNW suspects that all 71 of the vehicles purchased through Shulman have been exported.

At the core of the instant motions for summary judgment is one question: was Shulman an agent for any of Defendants, and if so, which ones? If Shulman was an agent for any of the Defendants, then that Defendant is bound by Shulman's actions, and may be liable to MNW for damages it sustained as a result of violations of Mercedes-Benz' non-exportation policy. Further, MNW may have a right to set-off grounded in the Indemnification Agreement signed by Shulman that allows MNW to hold funds deposited in its account pursuant to the purchase agreements entered into by Shulman, irregardless of where those funds originated.

In Indiana, an agency relationship is created when one person gives another person authority to act on his behalf. *Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.,* 478 F.Supp.2d 1076, 1088 (S.D. Ind. 2007), citing *Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind. Ct. App. 1997). Indiana recognizes three classifications of authority which lead to a finding that a person is acting as an agent: actual, apparent, and inherent. *Quality Foods, Inc. v. Halloway Associates Professional Engineers and Land Surveyors, Inc.,* 852 N.E. 2d 27, 31 (Ind. Ct. App. 2006). A principal will be bound by the contract entered into on his behalf by the principal's agent if the agent had actual or apparent authority to bind him or if the principal subsequently ratifies the agreement. *Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir. 1996). MNW

alleges that Shulman possessed all three types of authority. The Defendants, however, contend he did not. Additionally, MNW alleges that even if Shulman lacked authority, the Defendants ratified Shulman's actions. Again, the Defendants disagree. Although all parties suggest that summary judgment is appropriate here, "the question of whether an agency relationship exists and of the agent's authority is generally a question of fact." *Zimmerman v. McColley*, 826 N.E.2d 71, 79 (Ind. Ct. App. 2005). Each type of authority and ratification will be examined in turn.

Actual Authority

Actual authority is created "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Quality Foods, Inc.*, 852 N.E. 2d at 31 (quoting *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind. 2001)). "The focus of actual authority is the belief of the agent." *Scott v. Randle*, 697 N.E.2d 60, 67 (Ind. Ct. App. 1998). The elements of actual agency under Indiana law are a manifestation of consent by the principal to the agent, the agent's acceptance of the authority, and control exerted by the principal over the agent. *Johnson*, 679 N.E.2d at 507.

Because Shulman has not participated in this litigation, we know very little about what Shulman believed any of the Defendants

may have desired him to do, much less what the principals may have done to foster that belief.  The evidence occasionally shows what Shulman said to others, but (given Shulman's questionable character) even this sheds little light on what Shulman believed.

With regards to Mega, there is no evidence that Mega communicated anything to Shulman that would allow Shulman to enter into purchase agreements on its behalf as to any of the vehicles that were actually delivered.  Mega, however, contends in its interrogatories (again, these are signed by Sharpiro, who was not deemed knowledgeable enough of the company's affairs to sit for a Rule 30(b)(6) deposition in spite of Oransky's illness) that it *did* authorize the purchases of the vehicles which were not delivered. Mega asks this Court to accept as true a highly unlikely factual scenario: that every transaction Shulman entered into in its name that was completed satisfactorily was not authorized, but that it did authorize each of the three transactions that were not completed to its satisfaction.  Some facts in the record suggest that Mega's far-fetched telling may have some truth: VIP indeed concedes that it purchased cars through Shulman under Mega's license, and the record does not indicate whether Mega was aware of these transactions.  Perhaps Shulman knew he lacked authority to act on Mega's behalf and was taking advantage of the fact that he had come to possess Mega's license and TIF.  But, other facts suggest that Mega was more involved in these transactions than it

has acknowledged, and that some relationship with VIP may exist over and beyond what was disclosed. The facts before this Court leave too many questions unanswered to allow a finding either way regarding whether Shulman had actual authority to act for Mega. This Court, due to Oransky's convenient inability to participate and Shulman's escaping service of process, simply knows too little about what transpired between Mega and Shulman to make a determination at this stage of the litigation as to whether Shulman had actual authority to act on Mega's behalf.

With regards to Flash, Flash admits that, although operating without a license, it utilized Shulman to locate vehicles and negotiate purchases for Flash. Despite this concession, Flash claims that it did not authorize Shulman to sign the purchase agreements on its behalf. Additionally, Flash did not trust Shulman with the money needed to complete these transactions, which it knew were being conducted in another licensed dealer's name, so it wired the money to MNW directly. Again, too much is unknown about what transpired between Flash and Shulman for this Court to determine on summary judgment whether Shulman had actual authority to enter into these transactions or not.

With regards to VIP, the evidence submitted shows that Shulman contacted VIP and offered to serve as a broker or middleman negotiating purchases of vehicles on their behalf. VIP accepted Shulman's offer and admits it used Shulman as a broker. VIP

further admits that its name did not appear on sales agreements because Shulman told them that they should keep using Mega or Perfect's licenses, and that somehow (nobody seems to know how) Shulman had a VIP business card identical to Kart's but with Shulman's name and cell phone number.  This card was presented to Webb by Shulman.  As with Mega and Flash, this Court knows too little about what transpired between Alex Kart of VIP and Shulman to assess whether he had actual authority.

### Apparent Authority

Apparent authority exists where a third party reasonably believes that the principal has authorized the agent's acts. Apparent authority arises from the principal's direct or indirect manifestations to a third party. *Quality Foods, Inc.*, 852 N.E.2d at 32.  Placing an agent in a position to perform acts or make representations which appear reasonable to a third person is sufficient to endow the agent with apparent authority. *Yeager v. McManama*, 874 N.E.2d 629, 638 (Ind. Ct. App. 2007).  Placing an agent in the position of sole negotiator on his behalf may make it reasonable for a third person to believe that the agent possesses authority to act for the principal. *See Scott*, 697 N.E.2d at 67. However, "[a] communication of authority made solely by the agent is inadequate." *Zimmerman,* 826 N.E.2d at 79.

Here the Defendants' representations to MNW were nearly nonexistent. With regards to Mega, the only thing that can perhaps be said to be a representation is that Mega permitted Shulman to possess the documents necessary for him to conduct the types of transactions that he in fact conducted. This Court is then faced with determining whether this possession of documents alone suffices to create apparent authority. MNW contends that the possession of these documents instilled in MNW a reasonable belief that Shulman was authorized to act on behalf of Mega. This belief was fostered over time by the fact that Schulman did not just purchase one vehicle, but numerous vehicles over the course of months utilizing Mega's license. Kart testified in his deposition that Shulman informed VIP that Mega had given him its wholesale license for Shulman to use to buy cars "if Mega ever needed" cars. (Kart Dep. at 117-119). Shulman's mere possession of these documents is not a sufficient communication with MNW for this Court to find that Shulman possessed apparent authority.

As to Flash and VIP, it appears that their only communication with MNW, if it can be called that, was to deposit funds in MNW's account. The record suggests that MNW was not aware of their existence until after MNW retained their funds. Accordingly, agency cannot be based on either Flash or VIP's communications with MNW.

<u>Inherent Authority</u>

Inherent authority is grounded in neither the principal's conduct toward the agent nor the principal's representation to a third party. Rather, it originates from the customary authority of a person in the particular type of agency relationship. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000). "[T]he acts of an agent with inherent authority only bind the principal where (1) the acts done are those which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, (2) the other party reasonably believes that the agent is authorized to do them, and (3) the other party has no notice that he is not so authorized." *Id.* With regards to inherent authority, the record suggests both that MNW believed Shulman was authorized to engage in these transactions on behalf of Mega and/or Perfect, and that MNW did not have notice that he was not so authorized. A question of fact remains, however, regarding MNW's belief was reasonable and whether the acts done are those which usually accompany or are incidental to transactions which the agent is authorized to conduct, although they are forbidden by the principal.

<u>Ratification</u>

"When a principal, with full knowledge of the facts, appropriates the fruits of an agent's unauthorized act, the principal may not complain later that the agent acted without authority." *Blairex Laboratories, Inc. v. Clobes,* 599 N.E.2d 233, 236 (Ind. Ct. App. 1992). There is a question of fact regarding whether Mega, VIP or Flash had full knowledge of the facts. For example, it is not clear that any of these Defendants had knowledge that Shulman was required to sign the export agreement, and it is by that act that MNW alleges that Shulman has bound them.

<u>The Counterclaims for Conversion</u>

As to Mega, Mega has conceded that it suffered no pecuniary loss. Accordingly, it cannot recover under a conversion theory, and summary judgment must be granted in MNW's favor on this claim.

As to Flash and VIP, these Defendants take the position that, because they were not named in the Indemnification Agreement, MNW has no right of set-off as to them. But one must also consider the reason for MNW's failure to include Flash and VIP in the Indemnification Agreement: these defendants chose to conceal (or at least not actively reveal) their involvement in the purchases. The reason for this is not entirely clear. Perhaps Flash was motiviated disclosure because it was operating without a license. Perhaps both Flash and VIP's motivation was more sinister, a

blatent attempt to evade the non-export policy. At any rate, the contract for the purchase of the vehicles did not name either Flash or VIP, but did name parties named in the Indemnification Agreement. The money at issue was paid pursuant to those contracts entered into by Shulman. Under these facts, MNW may be entitled to assume that, regardless of the name of the account from which the wire transfer originated, the money is being paid on behalf of the purchaser. Also, although now resolved, at one point VIP was not the only entity demanding return of the $150,905.00; Mega too claimed these funds as their own. There are genuine issues of material fact regarding whether MNW can exercise its right of set off over the funds and also regarding whether MNW had the requisite intent necessary for a finding that it committed conversion. Additionally, questions remain regarding the agreement that existed between Mega and VIP that resulted in VIP tendering these funds. Questions remain regarding whether Mega's license (which they admit they provided to Shulman) was being used with or without Mega's knowledge. Because it is not clear from the record before this Court whether MNW knowingly converted either Flash or VIP's funds, Flash and VIP's cross motions for summary judgment on their conversion claims must be denied.

<u>Flash's Counterclaim for Breach of Contract</u>

MNW's memorandum states the following:

> Flash cannot have it both ways. Flash cannot assert that it is entitled to maintain a claim for breach of contract and, at the same time, assert that Shulman was without authority to execute the very contract on which it relies. As Flash and MNW had no contact, Flash either relies upon the contracts executed by Shulman (and, therefore, is bound by all the terms at issue including the Acknowledgment and Indemnity Agreement) or disavows those contracts and cannot file suit for breach. Flash cannot have it both ways.

(DE 86 at 18).

This Court agrees that Flash cannot have it both ways. At this stage of the litigation, genuine issues of material fact (outlined above) prevent a determination amongst Flash's alternate theories.


<u>Flash's Counterclaim for Specific Performance</u>

Flash claims that the vehicles it sought to purchase were unique and seeks specific performance and delivery of these two vehicles. Unfortunately for Flash, even if Flash ultimately prevails on its breach of contract claim, MNW is not capable of specific performance as the vehicles at issue have been sold to third parties and are not within MNW's control. *See UFG, LC v. Southwest Corp.* 848 N.E.2d 353, 361 (Ind. Ct. App. 2006). Furthermore, there is no evidence that damages would not be an adequate remedy. *See NIPSCO v. Carbon County Coal Co.,* 799 F.2d

265, 279 (7th Cir. 1986).  Accordingly, summary judgment must be granted in MNW's favor on Flash's claim for specific performance.


CONCLUSION

The allegations of the parties to this litigation are in conflict in many material respects, and in many instances, the allegations are simply too far fetched to be believed.  Summary judgment is not an appropriate vehicle by which to make credibility determinations, and that is precisely what is necessary in this case.  For the reasons set forth above, the instant summary judgment motions are **DENIED** except as to Flash's claim for specific performance and Mega's counterclaim for conversion, which must be **DISMISSED**.  In those two respects, summary judgment is **GRANTED** in favor of MNW.

**DATED: July 21, 2010**           **/s/RUDY LOZANO, Judge**
                                   **United State District Court**