# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| MNW, LLC, an Indiana limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:08-CV-119-TLS |
| | ) | |
| MEGA AUTO GROUP, INC., a Delaware | ) | |
| corporation; PERFECT AUTO SALES, INC., | ) | |
| a New York corporation; MARK SHULMAN; | ) | |
| FLASH AUTO GROUP, INC., a New York | ) | |
| corporation; and VIP MOTOR GROUP, LLC, a | ) | |
| New York limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This case concerns the export of forty-one Mercedes-Benz automobiles. All were purchased from the Plaintiff. All were purchased pursuant to contracts with either Defendant Mega Auto Group, Defendant Perfect Auto Sales, or Defendant Mark Shulman. Both Defendants Mega and Perfect have been defaulted in this action. All of the purchase contracts were negotiated by Defendant Shulman, who was never served with process in this action. Defendants Flash Auto Group and VIP Motor Group ultimately obtained several of the forty-one vehicles in question, and exported many of the vehicles so obtained. As of November 30, 2009, the Plaintiff had been assessed $65,650.28 in penalties by Mercedes-Benz; of these penalties, $38,280.46 are attributed to vehicles exported by Defendant VIP, and $6,983.07 to a vehicle exported by Defendant Flash. From April 14–18, 2008, Defendants VIP and Flash deposited a total of $296,615 into the Plaintiff's account for the purchase of five different Mercedes-Benz vehicles. The Plaintiff has refused to either deliver the vehicles or return the $296,615 to the Defendants.

The Plaintiff purports to withhold the funds pursuant to a right of offset under an Indemnity Agreement signed on April 17, 2008. The Plaintiff seeks a declaratory judgment on Count II of its Amended Complaint [ECF No. 7] that it is entitled to retain the $296,615 under the terms of the Indemnity Agreement, and further seeks attorney fees. Defendants VIP and Flash counterclaimed for conversion and criminal conversion, seeking treble damages and attorney fees.

The case proceeded to a three-day bench trial from October 11–13, 2011, on the contract and tort issues. The Court, having heard and determined the credibility of the witnesses and having considered the arguments of counsel and the applicable law, in accordance with Federal Rule of Civil Procedure 52(a), enters the following findings of fact and conclusions of law.[1]

## FACTUAL FINDINGS

After considering the evidence and arguments of counsel, the Court now finds the following facts to be material and supported by a preponderance of the evidence:

1.  The Plaintiff, MNW, LLC, is a limited liability company with its principal place of business in Fort Wayne, Indiana. The Plaintiff owns and operates the Mercedes-Benz dealership in Fort Wayne, Indiana, known as Mercedes-Benz of Fort Wayne. The Plaintiff is owned by Douglas McKibben and Paul Webb. Webb also acts as general manager of the dealership.

2.  Defendant VIP is a limited liability company organized under the laws of the State of

---

[1]During the course of the bench trial, the Court withheld ruling on the admission of certain exhibits offered by the parties. Having now reviewed the record in its entirety, the Court admits each and every one of those exhibits, over objections. Furthermore, the Court has taken those exhibits into consideration in its analysis and in the issuance of this Opinion and Order where indicated.

New York. Defendant VIP is owned by Alex Kart and Genady Furman. Defendant VIP is a licensed automobile wholesaler. Defendant VIP did not, however, maintain a dealership lot. Rather, Defendant VIP maintained solely an office location. Defendant VIP opened its office on February 13, 2008.

3.     Defendant Flash was a New York corporation with its office in Brooklyn, New York. Defendant Flash was in the business of wholesaling vehicles and, on occasion, would retail a vehicle. Defendant Flash, however, operated without a wholesale or retail license. Michael Lykov was Defendant Flash's business manager, and Constantine Pshenichniy was the sole member.

4.     Defendant Mega was a Delaware corporation. Defendant Mega's principal, Igor Oranski, passed away during the pendency of this case. Prior to Oranski's death, Defendant Mega was in the business of buying and selling automobiles. Defendant Mega was a licensed wholesaler. Defendant Mega initially appeared and defended in this action. But after the Court granted motions to withdraw by the attorneys for Defendant Mega, and after Defendant Mega failed to obtain successor counsel, the Clerk entered default against Defendant Mega on June 1, 2011 [ECF No. 170].

5.     Defendant Perfect was a New York corporation. Oleg Chelchilnitsky was Defendant Perfect's sole owner. Chelchilnitsky filed bankruptcy on or about August 2009, and took no further action in this case. (See *In Re Chelchilnitsky*, United States Bankruptcy Court for the Eastern District of New York, Cause No. 1-09-47157.) Defendant Perfect, prior to June 2008, was a licensed wholesaler in the business of buying and selling automobiles. Although Defendant Perfect initially appeared and defended in this action, after the Court

granted motions to withdraw by the attorneys for Defendant Perfect, and after Defendant Perfect failed to obtain successor counsel, the Court entered default against Defendant Perfect on March 30, 2010 [ECF No. 120].

6. Defendant Mark Shulman, also known as Alex Shulman, was an individual who held himself out as the owner of Defendants Mega and Perfect. Defendant Shulman produced dealer licenses and tax information for both companies and held himself out as authorized to purchase vehicles from the Plaintiff. Defendant Shulman was personally known to both Kart and Lykov and lived in the same neighborhood as Kart.

7. In November 2007, the Plaintiff purchased the Mercedes-Benz car dealership located in Fort Wayne, Indiana. Prior to November 2007, the dealership had been owned by Shaver Imports.

8. Prior to November 2007, Defendant Shulman had purchased a number of vehicles from Shaver Imports. Defendant Shulman worked with a salesman named Shaun Ivancic. Ivancic continued to work with Defendant Shulman upon the Plaintiff's purchase of the dealership.

9. From November 2007 to April 14, 2008, Defendant Shulman purchased 71 vehicles on behalf of Defendants Perfect and Mega, using first Defendant Perfect's and then Defendant Mega's dealer licenses. Defendant Shulman provided the Plaintiff with copies of the dealer licenses and tax exemption information for both Defendants Perfect and Mega. Defendant Shulman also provided a copy of Defendant Mega's insurance certificate. Notably, the dealer license furnished by Defendant Mega and relied upon by the Plaintiff in spring 2008 was purportedly issued on November 31, 2008, and expired

on December 31, 2008. (Pl.'s Ex. 5.)

10.  In November 2007, when Defendant Shulman, on behalf of Defendant Perfect, contacted

the Plaintiff to purchase vehicles, he executed at least two Acknowledgments of Export

Policy. The Acknowledgments stated:

> MERCEDES-BENZ OF FORT WAYNE, AS AN AUTHORIZED
> MERCEDES-BENZ DEALER IS SOLELY PERMITTED TO
> DISTRIBUTE MERCEDES-BENZ VEHICLES WITHIN
> MBNA'S EXCLUSIVE SALES TERRITORY (NORTH
> AMERICA).  IN THE EVENT THAT A MERCEDES-BENZ
> VEHICLE, WHICH IS SOLD BY MERCEDES-BENZ OF FORT
> WAYNE, IS EXPORTED FROM THE PERMITTED SALES
> TERRITORY [SIC], MBNA ASSESSES CHARGES AND OTHER
> RELATED COSTS AGAINST THE DEALER WHICH SOLD
> OR LEASED THAT VEHICLE.  AS SUCH, MERCEDES-BENZ
> OF FORT WAYNE, AS AN AUTHORIZED DEALER
> REQUIRES THAT A PURCHASER OR LESSEE OF A NEW
> MERCEDES-BENZ VEHICLE AFFIRMATIVELY WARRANT
> AND REPRESENT IN WRITING THAT THE VEHICLES
> BEING PURHCASED [SIC] OR LEASED ARE INTENDED
> FOR USE WITHIN THE AFOREMENTIONED SALES
> TERRITORY AND THAT THE VEHICLES WILL NOT BE
> EXPORTED DIRECTLY OR INDIRECTLY FROM THE SALES
> TERRITORY.  IT IS DIFFICULT TO ASCERTAIN THE
> SPECIFIC AND TOTAL COST OF ALL CHARGES AND
> ASSESSMENTS THAT MAY OCCUR IN THE EVENT OF AN
> EXPORT OF A VEHICLE SOLD OR LEASED BY
> MERCEDES-BENZ OF FORT WAYNE.  THEREFORE, THE
> PURCHASER OR LESSEE OF SAID VEHICLE AGREES THAT
> THE SUM OF $7,500.00 (SEVENTY-FIVE HUNDRED
> DOLLARS) IS A REASONABLE ESTIMATE OF THE COSTS
> WHICH WILL BE INCURRED BY MERCEDES-BENZ OF
> FORT WAYNE AS A DIRECT AND PROXIMATE RESULT OF
> SAID NEW MERCEDES-BENZ VEHICLE BEING EXPORTED
> FROM THE MBNA SALES TERRITORY.  THE PURCHASER
> OR LESSEE OF ANY NEW MERCEDES-BENZ VEHICLE
> FROM MERCEDES-BENZ OF FORT WAYNE AGREES THAT,
> IN THE EVENT THE NEW MERCEDES-BENZ VEHICLE IS
> EXPORTED FROM THE PERMITTED SALES TERRITORY
> WITHIN ONE YEAR FROM THE INITIAL DELIVERY OF
> SAID VEHICLE, THE PURCHASER OR LESSEE SHALL BE

OBLIGATED TO PAY MERCEDES-BENZ OF FORT WAYNE
AS LIQUIDATED DAMAGES, THE SUM OF $7,500.00.
EXECUTION OF THE PURCHASE/LEASE DOCUMENTS BY
THE PURCHASER/LESSEE SHALL CONSTITUTE
ACCEPTANCE OF THESE TERMS AND CONSTITUTE
ACCEPTANCE OF THE TERMS AND CONDITIONS
AGREEMENT THERETO.

(Pl.'s Ex. 2 at MNW 37, 39.) Defendant Shulman subsequently, in March 2008, began purchasing vehicles for Defendant Mega. He executed an Acknowledgment on behalf of Defendant Mega. (*Id.* at MNW 8.) Although it was the stated policy of the Plaintiff that an Acknowledgment of Export Policy would be executed for each vehicle sale, many of the vehicle sales at issue do not include Acknowledgments. Furthermore, many of the Acknowledgments included with purchase orders are not signed or witnessed.

11.     Ivancic continued working with Defendant Shulman through January 21, 2008; however, later that month, Webb began working directly with Defendant Shulman so Ivancic would have more time to attend to his retail customers. Defendant Shulman usually contacted the Plaintiff by telephone and inquired whether the Plaintiff could locate a specific vehicle for him.

12.     If the Plaintiff was able to accomplish the dealer trade, it would negotiate the price with Defendant Shulman. Once a price had been negotiated, the Plaintiff's internal computer system would generate an internal transaction report which was sent to Defendant Shulman evidencing the purchase price, VIN, and amount owed on the car prior to the vehicle being contracted through finance. Defendant Shulman would then execute purchase agreements, either in person at Mercedes-Benz of Fort Wayne, or by receiving documents and returning them via overnight mail. The Plaintiff would not release a

vehicle for transport until it confirmed that the purchase funds had been wired to its account.

13.    In 2007, Mercedes-Benz USA's Export Policy (applicable to passenger cars and light trucks) provided for an extraterritorial service commission charge plus a $250 administration fee to be assessed against a dealer who sold a Mercedes-Benz vehicle that was subsequently exported outside the United States or its territories and was identified by Daimler Chrysler AG's (DCAG) foreign dealer network as an export within twenty-four months of the vehicle's retail date. The 2007 policy was as follows:

> For any Passenger Car [or Light Truck] identified by DCAG as an export within twenty four months of the retail date and for which MBUSA received a DCAG extraterritorial service charge, the Dealer will incur an extraterritorial service commission charge plus a $250 administration fee regardless of whether the 2% Export Threshold Allowance has been met or exceeded. In addition the Passenger Car [or Light Truck] will be counted as an export and added to the monthly Export/Summary Report . . . . The charge to the dealer will take place in the month MBUSA receives notification thereof from DCAG.

(Pl.'s Ex. 1 at MNW 68 ¶ 4.3.)

14.    The extraterritorial service commission charge assessed against the dealer was equal to 5% of the manufacturer's suggested retail price (MSRP) in the country to which the vehicle was exported.

15.    Effective January 1, 2008, MBUSA's policy was revised. The 2008 policy provides:

> If a vehicle is identified by a Mercedes-Benz foreign dealer network and it is determined the vehicle was exported within one year of the original retail date, MBUSA will be assessed an Extraterritoral Commission (approximately equal to 5% of the foreign list price) by Daimler AG. MBUSA will in turn pass this monetary charge through to the appropriate dealer and assess a $300 administration fee increase (effective April 1, 2008). These charges apply to every unit for which the charge has been assessed to MBUSA and are not subject to the 2% Export Allowance Threshold. Be advised it can take up to

24 months for MBUSA to be notified of these charges.

(*Id.* at MNW 49.)

16.     In addition to the financial charges assessed against a dealership, MBUSA subjected dealers to a chargeback against their inventory to account for vehicles that had been exported. The chargeback reduces the number of vehicles MBUSA allocates to the dealer for sale thereby reducing the dealer's profitability.

17.     The Plaintiff suffered chargebacks in 2008 as a result of the export of the vehicles sold to Defendants Perfect and Mega. Once a dealership surpasses the allowable threshold (2% of annual sales objective), the chargebacks and costs are retroactive to the first vehicle exported. Chargebacks consist of a like model of every exported vehicle. The Plaintiff was unable to determine the actual lost income suffered as a result of the chargebacks in 2008 because it is impossible to determine what sales would have been made if the Plaintiff had been allocated the vehicles.

18.     Webb discussed the Acknowledgment of Export Policy, including the $7,500 liquidated damages provision in the event of export, with Defendant Shulman. Defendant Shulman never objected to the Export Policy. Moreover, the Plaintiff would not have sold any vehicles to Defendants Perfect or Mega if Defendant Shulman had refused to sign the Acknowledgment.

19.     As stated, in the latter part of March 2008, Defendant Shulman began purchasing vehicles in the name of Defendant Mega. Defendant Shulman presented himself as the owner of Defendant Mega and presented the Plaintiff with Defendant Mega's dealer information.

20.    Even though Defendant VIP held a wholesale license and could have purchased the

vehicles directly from the Plaintiff in its own name and still preserved the transaction as a

tax exempt transaction, Kart stated that he agreed with Defendant Shulman to simply

leave in place whatever arrangement Defendant Shulman had with the Plaintiff. That

arrangement included purchasing vehicles using Defendant Mega's license. Further, the

three cars that are the subject of Defendant VIP's counterclaim were actually to be

purchased by Defendant Mega using Defendant Mega's license. Defendant VIP knew

that Defendant Shulman was in possession of Defendant Mega's license, was authorized

to purchase vehicles on behalf of Defendant Mega, and was using Defendant Mega's

license to purchase vehicles from the Plaintiff.

21.    There was no written contract or other document evidencing the terms under which

Defendant VIP provided the purchase funds for any of the vehicles purchased by

Defendant Mega. Defendant VIP received purchase agreements for each of the twenty-

one cars that it claims to have purchased from the Plaintiff via Defendant Shulman. None

of those purchase agreements were in the name of Defendant VIP. Rather, each of those

purchase agreements was in the name of Defendants Mega or Perfect. Defendant VIP

never, prior to April 20, 2008, informed the Plaintiff that it claimed to be the actual or

end purchaser of the vehicles. Defendant VIP never requested that the purchase

agreements or titles show Defendant VIP as the purchaser or owner of the vehicles.

22.    Defendant Flash, as opposed to Defendant VIP, never held a wholesale license.

Defendant Flash was not, therefore, able to purchase tax exempt wholesale vehicles

directly from the Plaintiff, and the Plaintiff would not have sold wholesale vehicles to

Defendant Flash.

23.     Defendant Flash also received the title or Certificate of Origin for each of the vehicles it purchased that the Plaintiff sold to either Defendant Perfect or Mega. Each of those titles was also in the name of Defendant Perfect or Mega. Defendant Flash did not inform the Plaintiff that it claimed to be the actual purchaser of any of the vehicles at issue or that the purchaser identified as the owner on the title was incorrect.

24.     Defendant Flash admitted that it knew of the Export Policy at the time it claims to have purchased vehicles from the Plaintiff. Defendant Flash knew that Mercedes-Benz USA prohibits dealers from selling for export. Defendant Flash admitted that on a previous occasion Defendant Flash informed another Mercedes-Benz dealership of its intent to export and that dealership then declined to sell to Defendant Flash because of the Export Policy. Defendant Flash admits that it never disclosed to the Plaintiff that the vehicles were being purchased for export. Defendant VIP also admitted that it was aware of the Mercedes-Benz Export Policy prior to April 17, 2008.

25.     No representative of either Defendants Flash or VIP ever introduced him or herself to Webb, McKibben, or any other representative of the Plaintiff prior to April 17, 2008. No representative of Defendants Flash or VIP ever negotiated with any representative of the Plaintiff for the purchase of any vehicle.

26.     Webb, McKibben, and Ryan Campbell, the Plaintiff's Chief Financial Officer, participated in weekly management meetings, held on Thursdays. During the Thursday meeting on March 20, 2008, Webb, McKibben, and Campbell discussed Defendant Shulman and his assurances that he was not exporting vehicles. Campbell, Webb, and

McKibben then called Defendant Shulman from the conference room located at Mercedes-Benz of Fort Wayne.

27.    After their conversation with Defendant Shulman on speaker phone, Campbell telephoned Steven Hazelrigg, counsel for the Plaintiff, and asked him to prepare an indemnification contract for signature by Defendant Shulman on behalf of Defendant Perfect.

28.    The next time Campbell and Webb met at Mercedes-Benz of Fort Wayne for their regularly scheduled meeting was April 17, 2008. On that date at 12:59 p.m., Campbell emailed a draft agreement already in his possession to Hazelrigg for review. The draft agreement closely mirrored the language from the Acknowledgment of Export Policy. Campbell requested that Hazelrigg review and return the agreement as the Plaintiff intended to have Defendant Shulman execute an agreement that day.

29.    That same day, at 2:32 p.m., Hazelrigg forwarded the Indemnity Agreement to Campbell via email. Webb signed the Indemnity Agreement on behalf of the Plaintiff. With McKibben's permission, Campbell signed McKibben's name to the Indemnity Agreement. Both Webb and Campbell were at Mercedes-Benz of Fort Wayne at the time of signing.

30.    Webb then called Defendant Shulman and told him that the Indemnity Agreement had been drawn up and that Webb was going to fax the Indemnity Agreement to Defendant Shulman. Webb asked if Defendant Shulman was going to sign it. Defendant Shulman agreed. Thereafter, Webb faxed the Indemnity Agreement to Defendant Shulman. Webb used the same fax number he had previously used for Defendant Shulman and which he had been using to provide Defendant Shulman with documents for the past several

months. Campbell was not present when Webb faxed the Indemnity Agreement to Defendant Shulman.

31.   Five minutes later, the document was faxed back to Mercedes-Benz of Fort Wayne and received by Webb. Campbell was not present when Webb received the fax from Shulman on April 17. The document faxed back was signed by Defendant Shulman on behalf of Defendants Mega and Perfect, and by Defendant Shulman individually. Campbell faxed a copy of the executed Indemnity Agreement to himself for his records. The time stamp on his faxed copy indicates that he received it at 4:59 p.m. on April 17. (Pl.'s Ex. 29.)

32.   Several of the purchase agreements and Acknowledgments admitted into evidence by stipulation of the parties were signed by Defendant Shulman while he was physically present at Mercedes-Benz of Fort Wayne. Both Webb and Ivancic witnessed Defendant Shulman signing purchase agreements and Acknowledgments and testified that the signatures on those documents were Defendant Shulman's.

33.   The Indemnity Agreement executed on April 17, 2008, states:

THIS INDEMNITY AGREEMENT (the "Agreement") is made this 17th day of April, 2008, between Perfect Auto Sales, Inc., Mega Auto Group, and Mark Shulman (each, an "Indemnitor") in favor of MNW, LLC doing business as Mercedes-Benz of Fort Wayne, Douglas G. McKibben and Paul Webb (each, an "Indemnitee").

From time to time Indemnitor purchases and has purchased new Mercedes-Benz passenger cars and light trucks from an Indemnitee (the "Mercedes-Benz Vehicles"). Indemnitees are subject to vehicle export policies imposed by Mercedes-Benz USA and/or its affiliated entities, which restrict, prohibit and/or regulate the export of the Mercedes-Benz Vehicles outside of the United States (the "Mercedes-Benz Policy"). Indemnitee would not sell to Indemnitor any such Mercedes-Benz Vehicles if it was aware that Indemnitor either intended to or did in fact participate in any way in the export of such Mercedes-Benz Vehicles or violated the Mercedes-Benz Policy. Indemnitor has represented to Indemnitee that it does not, has not and will not participate in the export of any such Mercedes-Benz Vehicle or violation of the Mercedes-Benz

Policy.

NOW, THEREFORE, in consideration of the mutual promises herein contained and the past and future sale of vehicles by Indemnitee to Indemnitor the parties hereto agree as follows:

1.    <u>Indemnity</u>.  Indemnitor shall indemnify Indemnitee from and against any and all liability, charge, damages, loss, cost or expense, including, but not limited to, reasonable attorney fees, which any Indemnitee may suffer or incur as a result of export of a Mercedes-Benz Vehicle or the violation of the Mercedes-Benz Policy. In addition, because the costs or damages which may be suffered by Indemnitees as a result of such export or violation may include the loss of quota vehicles by Indemnitee and may be difficult to quantify, Indemnitors shall pay to Indemnitees the agreed amount of $7,500 for each Mercedes-Benz Vehicle in respect of which any Indemnitor participates, directly or indirectly, in the export or each violation of the Mercedes-Benz Policy. Any such obligation or liability of Indemnitor shall be due and payable from Indemnitors, jointly and severally, upon demand, and, to the extent not recovered by offset by Indemnitee at its sole election against sums or performance owing to any Indemnitor, shall be paid not later than 60 days after demand with interest at the rate equal to the published prime rate.

3.    <u>Term</u>.  The obligations of Indemnitor under this Agreement shall commence on the date of execution hereof in respect of all Mercedes-Benz Vehicles purchased at any time, whether in the past or future, from an Indemnitee, and shall continue in full force and effect for so long as any Indemnitee may be exposed to risk or loss under the Mercedes-Benz Policy in respect of any Mercedes-Benz Vehicle purchased by an Indemnitor from any Indemnitee.

4.    <u>Incorporation of Merdedes-Benz Policy</u>. Each of the terms and conditions of the Mercedes-Benz Policy are incorporated herein by reference. Each Indemnitor will be deemed in breach of this Agreement in the event of any default or breach under the terms of the Export Policy resulting from the acts or omissions of an Indemnitor. In the event of default, each Indemnitee shall have the right to enforce as to any Indemnitor all rights and obligations arising under the Export Policy, including but not limited to those relating to remedies, financial information, affirmative and negative covenants, representations and warranties, and other miscellaneous terms and conditions.

5.    <u>Expenses</u>. Indemnitors will pay any legal, accounting, documentary, search and other fees, costs and expenses incurred by Indemnitees in the enforcement of rights under this Agreement. Payment shall be made promptly following receipt of any invoice for such fees, costs and expenses.

(Pl.'s Ex. 10.) The words "17th" and "April" in the first line were hand-written by Campbell.

34. On April 17, 2008, at 6:36 p.m. Eastern Time, Webb received an email from Wade Messing, the area Market Manager for Mercedes-Benz USA responsible for monitoring sales activities at Mercedes-Benz of Fort Wayne. Messing's responsibilities included notifying the Plaintiff if any of the Plaintiff's vehicles were exported in violation of the Export Policy.

35. Messing's email followed a telephone call Messing had with Webb immediately before he sent Webb the email, informing Webb that he was about to receive an email. That telephone call and the email following it were the first notice to the Plaintiff that any of the vehicles it had sold to Defendants Mega or Perfect had been exported. The email contained a report with a list of vehicles that had been exported. Of the twenty-two vehicles on the list, nineteen had been purchased by Defendants Mega or Perfect.

36. As a dealer, the Plaintiff did not have access to the system that generated the report forwarded by Messing.

37. Upon receiving notice from Messing, Webb immediately called Defendant Shulman and notified him that vehicles purchased by Defendants Mega and Perfect had been exported in violation of the Acknowledgment and Indemnity Agreement. The Plaintiff ceased all sales to Defendants Mega or Perfect. Webb further informed Defendant Shulman that the Plaintiff would not release any funds in its possession.

38. At 7:24 p.m. on April 17, Webb forwarded Messing's email to McKibben and Campbell. Above the forwarded message, Webb stated:

> I should have known if the money was this easy it was to [sic] good to be true, sorry I got caught up in this shit and caused all the bullshit. But I will tell both of you that I will work my ass off to not lose any ground.

(Pl.'s Ex. 18.)

39. From early March to April 2008, Defendant VIP purchased and received delivery of twenty-one vehicles from the Plaintiff through Defendant Shulman. Defendant VIP paid for each vehicle by wire transfer to the Plaintiff's account. Each wire transfer lists the vehicle identification number of the vehicle being purchased. The Plaintiff knew that Defendant VIP was the entity wiring funds into its account for the purchase of vehicles. On March 26, 2008, Webb sent Defendant VIP an email notifying it of new instructions for wire transfers. (Def. VIP's Ex. F.) Furthermore, Kart testified that from time to time he called Webb to confirm receipt of wire transfer funds.

40. On April 14, 15, and 17, 2008, Defendant VIP made three wire transfers totaling $150,905.00 to the Plaintiff's account for the purchase of three vehicles.

41. From November 2007 to April 2008, Defendant Flash purchased and received delivery of twenty-two vehicles from the Plaintiff through Defendant Shulman. Defendant Flash paid for each vehicle by wire transfer to the Plaintiff's account. Each wire transfer identifies Defendant Flash as the originator, and the Plaintiff was able to determine the originator of each wire transfer by accessing its online account, but Campbell testified that it was not his practice in 2007 and 2008 to do so.

42. On April 18, 2008, Defendant Flash made two wire transfers totaling $145,710.00 to the Plaintiff's account for the purchase of two vehicles. The buyer orders for these vehicles are dated April 17.

43. Within a few days of the conversation with Defendant Shulman informing him of violations of the Export Policy, Webb began receiving telephone calls from other persons claiming that the money being held by the Plaintiff belonged to each of them. Both Kart and Lykov telephoned Webb and demanded the return of the funds transferred from Defendants VIP and Flash into the Plaintiff's account.

44. The entire $296,615.00 retained by the Plaintiff that was originally wired into the Plaintiff's general checking account remains as a contingent liability on the Plaintiff's balance sheet. The money has not been isolated in a different account nor did the Plaintiff set up a separate account for the amount of money at issue in this case. While the Plaintiff has co-mingled the funds with other funds owned by the Plaintiff, it has not spent the money.

45. As a result of multiple demands for the funds, on May 6, 2008, the Plaintiff filed the present suit for a declaratory judgment seeking a determination of the ownership of the funds.

46. Lykov and Kart maintained a relationship with Defendant Shulman even after this lawsuit was filed. According to Kart, he would inform Defendant Shulman of what was going on in this lawsuit, but never requested that Defendant Shulman become involved in the lawsuit. Lykov states that he never discussed this case with Defendant Shulman.

47. A total of forty-one of the vehicles purchased by Defendant Shulman for Defendants Mega and/or Perfect were exported. The Plaintiff was required to pay $65,650.28 to Mercedes-Benz USA as a result of the exportation of vehicles purchased by Defendants Mega and Perfect. (Pl.'s Ex. 25.) Of this amount, $38,280.46 is attributable to vehicles

exported by Defendant VIP, and $6,983.07 is attributable to a vehicle exported by Defendant Flash. (*Id.*)

## CONCLUSIONS OF LAW

**A.      Issues to be Decided**

Since April 2008, the Plaintiff has been continuously in possession of the $296,615.00 wired into its account by Defendants VIP and Flash. The Plaintiff claims a right to retain these funds under the contracts with Defendants Perfect, Mega, and Shulman, the Acknowledgments of Export Policy, and the Indemnity Agreement. The Court must determine, first, the rights of the parties under the relevant agreements, and second, whether the Plaintiff has committed tortious or criminal conversion by retaining the funds.

**B.      Jurisdiction, Venue, and the Burden of Proof**

As an initial matter, the Court has subject matter jurisdiction over this case because there is diversity of citizenship and the amount in controversy exceeds $75,000.00 (exclusive of interest and costs). 28 U.S.C. § 1332. The Court's exercise of personal jurisdiction is proper because, among other reasons, the parties have actively litigated this case and proceeded to trial on the merits without raising a Rule 12(b)(2) motion. *Blockowicz v. Williams*, 630 F.3d 563, 566 (7th Cir. 2010). Venue is proper because a substantial part of the events giving rise to the parties' claims occurred in the Northern District of Indiana. 28 U.S.C. § 1391(a)(2).

The Plaintiff has the burden of proving the elements of its claims by a preponderance of the evidence. *Gash v. Kohm*, 476 N.E.2d 910 (Ind. Ct. App. 1985). Similarly, the Defendants

each have the burden of proving the elements of their counterclaims and their affirmative defenses by a preponderance of the evidence. *Lacy v. White*, 288 N.E.2d 178 (Ind. Ct. App. 1972). An affirmative defense is a defense upon which the proponent bears the burden of proof and which, in effect, admits the essential allegations of the complaint, but asserts additional matter barring relief. *GKC Ind. Theatres, Inc. v. Elk Retail Investors, LLC*, 764 N.E.2d 647 (Ind. Ct. App. 2002).

Although a party with the burden of proof may, in some instances, rely on inferences in the absence of direct evidence, such inferences must be reasonable. "An unreasonable inference yields an arbitrary or capricious result based on speculation, guess, surmise, conjecture, or mere possibility." *Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993).

When default has been entered against a defendant, the facts alleged in the complaint against that defendant may not be contested. Rather, entry of default establishes, as a matter of law, that the defaulted defendants are liable to the plaintiff as to the well-pleaded factual allegations in the complaint, but not as to the amount of damages. *Davis v. Hutchins*, 321 F.3d 641, 648 (7th Cir. 2003) ("[W]hen a judge orders a default entered, the factual allegations in the complaint are deemed to be admitted by the defendant."); *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999) ("A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated) (citing *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992), a case involving entry of default but not a default judgment); *Priest v. Brummer*, No. 1:06-CV-065-TS, 2008 WL 2788759, at *4 (N.D. Ind. July 18, 2008) ("an entry of a default means that the factual allegations of [the plaintiff's] Complaint are to be taken as true (except those with

respect to the amount of damages)") (citing *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th

Cir. 1989)); *see also Black v. Lane,* 22 F.3d 1395, 1399 (7th Cir. 1994) (stating that "[w]hen a

default judgment is entered, facts alleged in the complaint may not be contested").[2]


### C.        Contract Interpretation and Indemnity Agreements

A valid contract requires offer, acceptance, consideration, and manifestation of mutual

assent. *Family Video Movie Club, Inc. v. Home Folks, Inc.*, 827 N.E.2d 582, 585 (Ind. App.

2005). As a general rule, the interpretation, construction or legal effect of a contract is a question

of law to be determined by the court. The unambiguous language of a contract is conclusive and

binding on the parties and the court, and the parties' intent is determined from the four corners of

the document. *Zukerman v. Montgomery*, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011). A contract

should be "read as a whole, and the language construed so as not to render any words, phrases,

or terms ineffective or meaningless." *Village Commons, LLC v. Marion Cnty. Prosecutor's

Office*, 882 N.E.2d 210, 215 (Ind. Ct. App. 2008). When the terms of a contract are "clear and

unambiguous, courts must give those terms their clear and ordinary meaning." *State Farm Mut.

Auto Ins. Co. v. Cox*, 873 N.E.2d 124, 127 (Ind. Ct. App. 2007). The court cannot make a

contract for the parties, nor is it at liberty to revise a contract, or supply omitted terms while

---

[2]Furthermore, the Plaintiff notes that "[i]f a party has it peculiarly within its power to produce witnesses whose testimony would elucidate a transaction, the fact that he does not do it creates a presumption that the testimony if produced would be unfavorable." *United States v. Addo*, 989 F.2d 238, 242 (7th Cir. 1993); *Rohrkaste v. City of Terre Haute*, 470 N.E.2d 738, 743 (Ind. Ct. App. 1984). The Plaintiff therefore argues that because the Defendants had it within their power to produce Defendant Shulman for trial, the Court should presume that Shulman's testimony would be unfavorable to the Defendants. The Court finds that even though Kart and Lykov may have interacted with Defendant Shulman more frequently than the Plaintiff, they did not have it peculiarly within their power to produce him for trial, and the Court will not apply this presumption.

professing to construe it. *Zukerman v. Montgomery*, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011). Indiana has long allowed contracting parties to enter into any agreement they desire so long as it is not illegal or against public policy. *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 391–92 (Ind. Ct. App. 2002) (citations omitted).

Under Indiana law, legal ownership of a vehicle is determined by the sale provisions of the Uniform Commercial Code (UCC). *Madrid v. Bloomington Auto Co.*, 782 N.E.2d 386 (Ind. Ct. App. 2003). Under the UCC, a contract for the purchase of a vehicle, as goods valued in excess of $500, is not enforceable by way of action or defense unless there is a written contract between the parties that is signed by the party against whom enforcement is sought or his authorized agent or broker. Ind. Code § 26-1-2-201. Moreover, a sale occurs when title to the goods passes from seller to buyer. *Id.* § 26-1-2-206.

To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee. *Ind. Dep't of Revenue v. Belterra Resort Ind., LLC*, 935 N.E.2d 174, 179 (Ind. 2010) (citation omitted). For consideration to be in the form of a benefit to the promisor, a legal right must be given to the promisor to which the promisor was not otherwise entitled. *Id.* "A detriment on the other hand is a legal right the promisee has forborne." *Id.* In any form, consideration must be a bargained-for exchange. *Id. See also Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 653 F. Supp. 2d 896, 914 (N.D. Ind. 2009) (stating that consideration consists of any bargained-for exchange).

In a contract, a condition precedent must be fulfilled before the duty to perform a specific obligation arises. *Ind. State Highway Comm'n v. Curtis*, 704 N.E.2d 1015, 1018 (Ind. 1998). If it does not occur, "performance of a duty subject to a condition cannot become due and if the

condition can no longer occur, the duty is discharged." *Id.* (quoting Restatement (Second) of Contracts § 225 (1981)).

"Indiana courts have recognized that indemnity agreements are a form of contract and, as such, are construed according to the rules and principles of the law of contracts." *Far West Ins. Co. v. J. Metro Excavating, Inc.*, No. 2:07-CV-11-PRC, 2008 WL 859182, at *8 (N.D. Ind. Mar. 28, 2008). If the words of the indemnity clause are clear and unambiguous, they must be given their plain and ordinary meaning and enforced; an indemnity agreement is construed "to cover all losses and damages to which it reasonably appears the parties intended it to apply." *Mead Johnson & Co. v. Kenco Grp., Inc.*, 899 N.E.2d 1, 3 (Ind. Ct. App. 2009) (quoting *Zebrowski & Assocs., Inc. v. City of Indianapolis*, 457 N.E.2d 259, 261 (Ind. Ct. App. 1983)).

### D.      The Acknowledgments of Export Policy

From November 2007 to April 2008, Defendant Shulman executed several documents entitled "Acknowledgment of Export Policy" on behalf of Defendants Mega and Perfect. These Acknowledgments were included in the deal jackets of some of the vehicles the Plaintiff sold to Defendants Mega and Perfect. Although representatives of the Plaintiff testified at trial that an Acknowledgment should be executed and included with every deal, many deal jackets did not include Acknowledgments. Furthermore, the Acknowledgments that do exist are in some cases unsigned and, in almost all cases, unwitnessed.

Nevertheless, the Plaintiff argues that Defendant Shulman executed at least one Acknowledgment of Export Policy on behalf of Defendant Mega and at least one on behalf of Defendant Perfect. The Plaintiff asserts that the Acknowledgment—by its terms—applies to

multiple transactions. Therefore, the Plaintiff argues, Defendants Mega and Perfect were bound to the terms of the Acknowledgment, and bound to pay $7,500 per exported vehicle as liquidated damages. Defendants VIP and Flash respond that the language of the Acknowledgment is ambiguous concerning whether it applied to more than one transaction. Defendants VIP and Flash would require the Plaintiff to produce an Acknowledgment of Export Policy for each vehicle transaction in order to hold Defendants Mega or Perfect liable to pay liquidated damages on that exported vehicle.

The Court finds that the language of the Acknowledgment of Export Policy clearly applies to multiple transactions. The Acknowledgment states:

> Mercedes-Benz of Fort Wayne, as an authorized dealer requires that a purchaser or lessee of a new Mercedes-Benz vehicle affirmatively warranty and represent in writing that the *vehicles* being purhcased [sic] or leased *are* intended for use within the aforementioned sales territory and that the *vehicles* will not be exported directly or indirectly from the sales territory. . . .

> The purchaser or lessee of *any* new Mercedes-Benz vehicle from Mercedes-Benz of Fort Wayne agrees that, in the event the new Mercedes-Benz vehicle is exported from the permitted sales territory within one year from the initial delivery of said vehicle, the purchaser or lessee shall be obligated to pay Mercedes-Benz of Fort Wayne as liquidated damages, the sum of $7,500.00. Execution of the purchase/lease documents by the purchaser/lessee shall constitute acceptance of these terms and constitute acceptance of these terms and conditions agreement thereto.

(Pl.'s Ex. 2 at MNW 37 (emphasis added).) The Defendants argue that there are certain passages of the Acknowledgment which speak in terms of a single vehicle. But the Court finds that the thrust of the document is an acknowledgment that the export of any vehicle will result in the obligation to pay liquidated damages. Furthermore, the language of the Acknowledgment clearly ties execution of future purchase documents to acceptance of the terms of the Acknowledgment. This suggests that every time Defendant Shulman executed purchase documents after having

already signed an Acknowledgment, he was reincorporating the terms of the Acknowledgment.

Moreover, in his affidavit, produced by Defendant Flash, Campbell states that the Plaintiff

"requires every *purchaser* . . . to execute an Acknowledgment of Export Policy." (Def. Flash's

Ex. M at ¶ 5 (emphasis added).) Because the evidence before the Court indicates that Defendant

Shulman executed at least one Acknowledgment on behalf of both Defendants Mega and Perfect,

and because no evidence indicates Defendant Shulman was unable to bind Defendants Mega and

Perfect, the Court finds that the Acknowledgments signed by Defendant Shulman obligated

Defendants Mega and Perfect to pay liquidated damages in accordance with the terms of the

Acknowledgments.[3]

**E.     The Indemnity Agreement**

The crux of the Plaintiff's request for a declaratory judgment against Defendants VIP and

Flash arises under the terms of the Indemnity Agreement, purportedly executed on April 17,

2008. All parties now agree that Defendants VIP and Flash are not parties to the Indemnity

Agreement, and that Defendant Shulman did not have authority to bind them to the terms of the

Indemnity Agreement.[4] Nevertheless, the Plaintiff maintains that under the terms of the

Indemnity Agreement it is justified in retaining the funds that Defendants VIP and Flash wired

into its account. The Court must decide whether the Indemnity Agreement is an authentic

---

[3]The Court notes that the Indemnity Agreement itself requires the Indemnitors to pay liquidated damages on exported vehicles, jointly and severally, whether the vehicles were previously purchased or are purchased in the future. Therefore, it appears the Indemnity Agreement would also obligate Defendants Mega and Perfect to pay liquidated damages in the event of export.

[4]Accordingly, the Court will not address whether Defendant Shulman was an agent of Defendants VIP and Flash, nor whether Defendant Shulman was a broker on behalf of Defendants VIP and Flash, as both of these theories have been abandoned by the parties.

contract, and if it is authentic, whether it justifies the Plaintiff's retention of the funds at issue.

1.      *The Indemnity Agreement is an Authentic Contract*

At trial, Webb and Campbell testified about the circumstances under which the Indemnity Agreement was drafted and eventually executed. In March 2008, Campbell was concerned about the possibility that vehicles Defendant Shulman purchased for Defendants Mega and Perfect were being exported. Webb assured him that Defendant Shulman had signed Acknowledgments of Export Policy, and had verbally averred that the vehicles would not be exported. Nevertheless, on March 20, 2008, Campbell contacted attorney Hazelrigg about drafting an indemnity contract. On the afternoon of April 17, Campbell received the final version from Hazelrigg. Campbell signed for McKibben with his permission. Webb signed for himself and as manager of the Plaintiff. Webb testified that he then called Defendant Shulman to confirm that he would sign the document. Next, Webb faxed the Indemnity Agreement to Defendant Shulman at the same fax number he had always used to send documents to Defendant Shulman. According to Webb, he received a fully executed Indemnity Agreement from Defendant Shulman via a fax five minutes later. After Webb received the return fax, Campbell faxed a copy of the executed document to himself for his records. The email Campbell received with a copy of the fully executed Indemnity Agreement shows that Campbell had received the document by 4:59 p.m. on April 17, 2008. At 6:36 p.m.[5] on April 17, Messing emailed Webb with notice of the export of many vehicles purchased by Defendant Shulman. Messing's email indicates that the export violations

_____

[5]Messing's office is located in Chicago, and the email is time stamped 5:36 p.m. (Pl.'s Ex. 18.) The testimony at trial was that his email was stamped with the time at his location. Thus, the email would have been sent at 6:36 p.m. Eastern Time. In any case, even if the email had been received by Webb at 5:36 p.m., it would have been more than thirty minutes after execution of the Indemnity Agreement.

had been "discussed today." (Pl.'s Ex. 18.) But the testimony at trial was that he had called Webb only a few minutes before sending the email.

Defendants VIP and Flash urge the Court to find that the Plaintiff has failed to meet its burden to show by a preponderance of the evidence that the Indemnity Agreement is an authentic contract. They argue that Defendant Shulman's signatures on the Indemnity Agreement do not match his signatures on the purchase orders and Acknowledgments of Export Policy executed in Ivancic's presence in November 2007. (*Compare* Pl.'s Ex. 2 at MNW 36–39 *with* Pl.'s Ex. 10.) They also point to purported inconsistencies in Webb's testimony, his motive to fabricate, a lack of corroborating circumstantial evidence, and Webb's response to Messing's email, in support of their theory that the Indemnity Agreement is not an authentic contract. The Plaintiff notes that the Defendants introduced no handwriting expert to debunk Webb's testimony that the signatures on the Indemnity Agreement are Defendant Shulman's. The Plaintiff also relies upon the detailed testimony of Campbell and Webb about the circumstances under which the Indemnity Agreement was executed, and the default of Defendants Mega and Perfect, which admits the validity of the Indemnity Agreement against those defendants as a matter of law.

Having considered the parties' arguments, having heard all the evidence produced at trial, and having opportunity to consider the demeanor and credibility of the witnesses, the Court finds by a preponderance of the evidence that the signatures on the Indemnity Agreement are authentic. A comparison of the November 2007 signatures[6] by Defendant Shulman with the

---

[6]Defendant Flash also urges the Court to compare Defendant Shulman's signatures on the Indemnity Agreement with his signatures on documents relating to transactions using Agreement with the Acknowledgments of Export Policy that still include the "Shaver Imports" language. (*See* Pl.'s Ex. 4 at MNW 6, 8, 135, 137, 140, 193, 196.) Defendant Flash makes this request as part of its larger theory that Webb must have begun by forging the purchase documents on the deals containing "Shaver Imports" forms, and only secondarily decided to forge signatures on the Indemnity Agreement. As the Court is

signatures on the Indemnity Agreement persuades the Court only that the signatures are similar. However, in the absence of expert testimony, the Court finds that the evidence produced by the Plaintiff has proved the veracity of the signatures on the Indemnity Agreement by a preponderance of the evidence. Further, the Court finds that the inconsistencies relied upon by Defendants Flash and VIP do not undermine Webb's credibility to such an extent that his testimony should be discredited. Most of the purported inconsistencies highlighted by the Defendants relate to when the Plaintiff used Shaver Imports forms, when it began using Mercedes-Benz of Fort Wayne forms, and whether forms could be printed from a computer or could be pulled from a pre-existing file folder. The Court finds that Webb's testimony on these points shows that the Plaintiff's business practices were not uniform, but does not evidence any intentional falsehood on the part of Webb. As to the other inconsistencies the Defendants underscore—the question of whether McKibben signed the Indemnity Agreement or whether Campbell signed for him, and the question of the order in which it was signed—the Court finds that Webb's testimony on these issues evidenced only a lack of memory, and does not, without more, convince the Court to discredit Webb's testimony about the circumstances of the execution of the Indemnity Agreement.

Defendant Flash argued at trial that the Plaintiff's initial failure to produce the signature page of the Indemnity Agreement attached to Campbell's email confirmation cuts against the veracity of the Indemnity Agreement. The Court overruled that objection at trial and admitted the email showing that Campbell had received the fully executed Indemnity Agreement by 4:59

primarily concerned with the veracity of the signatures on the Indemnity Agreement, the Court finds this inquiry only tangentially relevant, and in any case the signatures on the additional documents recommended by Defendant Flash do not change the Court's conclusion that Defendant Shulman's signatures on the Indemnity Agreement are authentic by a preponderance of the evidence.

p.m. on April 17. (Pl.'s Ex. 29.) No evidence before the Court suggests that the email lacked the signature page when Campbell received it on April 17. Indeed, the email itself shows the attachment of the Indemnity Agreement, which was appended at pages four and five of the email. All the evidence before the Court indicates Campbell received a complete copy of the fully executed Indemnity Agreement by 4:59 p.m. on April 17, which additionally supports the Court's conclusion that the Indemnity Agreement is authentic.

The Defendants argue that Webb's comments in the email he sent at 7:24 p.m. on April 17, forwarding Messing's email to McKibben and Campbell, are damning. They argue that because Webb's email makes no reference to the Indemnity Agreement which he alleges was signed just hours before, there must have in fact been no Indemnity Agreement at 7:24 p.m. on April 17. The Defendants argue that in the face of Messing's email, Webb would certainly have discussed the Indemnity Agreement and expressed some relief that it had been executed just in time to shield the Plaintiff from liability for the exports. The Defendants maintain that Webb's promise in the same email to "work [his] ass off to not lose any ground" shows his motive to fabricate the Indemnity Agreement, which must not have existed yet. (Pl.'s Ex. 18.) The Court is not persuaded by this argument, and finds that Webb's response to receipt of Messing's email is unsurprising under the circumstances. The Court notes that at trial, in response to a question about the necessity of the Indemnity Agreement, Webb stated: "Well, I frankly didn't know what an Indemnity Agreement was." (Trial Tr. vol. 1, 241:18–19, Oct. 11, 2011.) The Court finds that Webb's response to receipt of Messing's email—particularly because Webb is not an attorney—does not disturb its finding that a preponderance of the evidence shows the Indemnity Agreement to be an authentic contract.

Defendants VIP and Flash assert that the Court cannot credit the "remarkable series of coincidences required to endorse MNW's version of the events of April 17, 2008." (VIP's Post-Trial Br. 12, ECF No. 201; Flash's Post-Trial Br. 7, ECF No. 202.) The Court agrees that the evidence indicates the Indemnity Agreement was executed and the Plaintiff was notified of violations of the Indemnity Agreement all within a short period of time. Nevertheless, the Court finds that the Plaintiff has met its burden to show that the Indemnity Agreement is an authentic contract by a preponderance of the evidence.

2.      ***The Indemnity Agreement Provides for the Plaintiff to Retain the Funds at Issue***

The Plaintiff urges the Court to hold that, because the Indemnity Agreement includes a right of offset, the Plaintiff is justified in retaining the funds deposited in its account by Defendants VIP and Flash in April 2008. Defendants VIP and Flash characterize the Plaintiff's theory as "bankrupt," "novel," and "absurd." (Flash's Post-Trial Br. 1; VIP's Post-Trial Br. 7, 14.) The Plaintiff argues that its theory is a straightforward application of the contracts at issue. Defendants Shulman, Mega, and Perfect agreed, jointly and severally, to indemnify the Plaintiff in the event of the export of a vehicle the Plaintiff sold to them. Forty-one vehicles sold to Defendants Mega and Perfect through Defendant Shulman were exported. The Plaintiff claims it is entitled to $7,500 per vehicle exported under the Indemnity Agreement—a total of $307,500. Further, as the Indemnity Agreement gives the Plaintiff the right to collect "such obligation" through offset "at its sole election against sums or performance owing to any Indemnitor," the Plaintiff claims it has properly retained the funds advanced pursuant to the contracts signed by Defendant Shulman. (Pl.'s Ex. 10 at ¶ 1.)

The Defendants urge that they are not Indemnitors under the Indemnity Agreement, so they cannot be held to the terms of the Indemnity Agreement. The Court agrees that neither Defendant VIP nor Defendant Flash is listed as an Indemnitor in the Indemnity Agreement. But the Court finds that the Defendants' argument sidesteps the true analysis. The question for the purposes of the funds at issue is not whether Defendants VIP and Flash were Indemnitors under the Indemnity Agreement. Rather, the question for the Court's purposes is whether the $296,615 being held by the Plaintiff is "sums or performance owing to any Indemnitor" under the Indemnity Agreement.[7] (Pl.'s Ex. 10.)

The evidence before the Court shows that the funds deposited by Defendants VIP and Flash into the Plaintiff's account in April 2008 were paid pursuant to the series of contracts executed by Defendant Shulman. From November 2007 through April 2008, Defendant Shulman executed contracts to purchase vehicles, but no evidence suggests that Defendant Shulman ever paid the purchase price for the vehicles he contracted to purchase. Instead, Defendants VIP and Flash wired funds to purchase the vehicles for which Defendant Shulman had executed contracts with the Plaintiff. Thus, it appears the funds advanced by Defendants VIP and Flash were paid pursuant to the contracts signed by Defendant Shulman. The Plaintiff suggests this puts Defendants VIP and Flash in a position akin to that of a mortgage lender, which provides funds to a buyer in order to facilitate a transaction, but which has no contractual relationship with the

_____

[7]For that matter, the Plaintiff also misstates its recovery under the Indemnity Agreement, asserting that it "has the right to offset its damages against any funds in its possession." (Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 36, ECF No. 196.) Again, the Plaintiff has the right to offset its damages against any "sums or performance owing to any Indemnitor" (Pl.'s Ex. 10), not to any funds in its possession.

seller.[8] The Court agrees this is the essence of the situation presented in this case. Defendants VIP and Flash had no contractual relationship with the Plaintiff. Defendants VIP and Flash paid money to the Plaintiff. Defendants VIP and Flash now demand the return of their money from the Plaintiff. But as the Plaintiff points out, they cannot demand return of their money under the Indemnity Agreement, because they were not party to the Indemnity Agreement and were not bound to the Indemnity Agreement as parties. *See Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 618 (Ind. Ct. App. 2000) ("the existence of a valid contract depends upon mutuality of obligation"). Instead, the Indemnity Agreement itself gives the Plaintiff the right of offset as long as the funds it uses for offset are "sums or performance owing to any Indemnitor." That is exactly what the funds advanced by Defendants VIP and Flash were.

Defendants VIP and Flash ask the Court to separate these financial dealings into two sets of transactions, neither of which would make sense without the other. In essence, they insist that their payments to the Plaintiff had nothing to do with the contracts for purchase of vehicles. Similarly, they insist that Defendants Shulman, Mega, and Perfect contracted to purchase

---

[8]The Plaintiff also relies upon the case of *Town & Country Homecenter of Crawfordsville, Indiana, Inc. v. Woods*, 725 N.E.2d 1006 (Ind. Ct. App. 2000). In *Town & Country*, a supplier of materials sued a mortgage lender for failing to ensure payment to the supplier upon closing for a home. The court held that a mortgage lender did not have "a duty to oversee the repayment of all contractors and suppliers." *Id.* at 1010. The court also stated that "generally, a lender has no obligation to protect even the interests of its borrower unless bound to do so by an agreement." *Id.* The Plaintiff urges that *Town & Country* is "a mirror reflection of the situation" before the Court. (Pl.'s Resp. to Flash 7.) The Plaintiff attempts to analogize the mortgage lender in *Town & Country* to the Plaintiff's own position, arguing that just as a mortgage lender has no duty to a supplier absent an agreement, so the Plaintiff has no duty to the Defendants absent an agreement. The Court agrees with the Plaintiff's contractual assertion, but disagrees with its application of *Town & Country*. The *Town & Country* mortgage lender had not provided funds to the supplier. Nor does *Town & Country* analyze the relationship of a seller and a third party when the third party provides funds pursuant to a contract between seller and buyer. In *Town & Country*, the mortgage lender provided funds to a builder, not to the supplier. If anything, the Plaintiff is in the position of the *Town & Country* supplier, which had no relationship with the mortgage lender and so had no claim. In any case, the Court agrees that the Plaintiff has no contractual obligation to Defendants VIP and Flash under an agreement to which they were not parties.

vehicles without a contractual provision for payment. The financial arrangement between the parties could not have been as the Defendants assert. In truth, all evidence before the Court shows that the payments by Defendants VIP and Flash were exactly what they appear to be—payments pursuant to the contracts signed by Defendant Shulman on behalf of Defendants Mega or Perfect. Thus, it appears that a contractual default on the part of the Plaintiff would in fact make the funds advanced by Defendants VIP and Flash due and owing not to Defendants VIP and Flash, but under the contracts, due and owing to Defendants Shulman and Mega or Perfect. Accordingly, the funds advanced by Defendants VIP and Flash pursuant to vehicle purchase contracts signed by Defendant Shulman are "sums or performance owing" to Indemnitors under the Indemnity Agreement, and the Plaintiff's retention of those funds is justified by the valid Indemnity Agreement.

The Defendants raise several additional arguments in support of their assertion that the Indemnity Agreement itself is not a valid contract. First, the Defendants argue that the Indemnity Agreement lacks consideration. Defendant VIP argues that the Indemnity Agreement lacks consideration because the Plaintiff had no intention of any future performance at the time of execution. (VIP's Post-Trial Br. 12.) Defendant Flash argues that the Indemnity Agreement lacks consideration because at trial Webb stated that the Plaintiff did not give Defendants Shulman, Mega, or Perfect anything in exchange for their assent to the Indemnity Agreement. (Flash's Post-Trial Br. 7.) And both Defendants VIP and Flash argue that the Plaintiff cannot rely on past performance as consideration for a contract. *See Brown v. Addington*, 52 N.E.2d 640, 642 (Ind. Ct. App. 1944) ("By the great weight of authority a past consideration, if it imposed no legal obligation at the time it was furnished, will support no promise whatever."). The Court finds

these objections unavailing. In light of the Court's earlier ruling that the Indemnity Agreement was properly executed before 5 p.m. on April 17, and the evidence that the first notice the Plaintiff received of the export of one of its vehicles came immediately prior to Messing's 6:36 p.m. email, Defendant VIP's assertion that the Plaintiff had no intention of performing is unsupported. Further, the Court finds that Webb's statement at trial, given by a non-lawyer, has little bearing on the legal question of whether there was consideration for the contract. Finally, the language of the Indemnity Agreement itself forecloses the Defendants' objections as to past consideration. The Indemnity Agreement states that it is being executed "in consideration of the mutual promises herein contained and the past and future sale of vehicles by Indemnitee to Indemnitor." (Pl.'s Ex. 10.) The contract is supported by mutual promises and future sales. The Court will not inquire into the adequacy of consideration. *Tanton v. Grochow*, 707 N.E.2d 1010, 1013 (Ind. Ct. App. 1999). Accordingly, the Defendants' consideration objections fail.

The Defendants next argue that any amount due under the Indemnity Agreement was only due "upon demand," and as the Plaintiff failed to make demand that Defendants VIP or Flash pay pursuant to the Indemnity Agreement, the Plaintiff failed to satisfy a condition precedent to a payment obligation under the Indemnity Agreement. (*See* VIP Proposed Findings of Fact, Conclusions of Law ¶ 22(f), ECF No. 198; Flash Proposed Findings of Fact and Conclusions of Law ¶ 83, ECF No. 199.) The Plaintiff responds that it had no obligation to make demand upon non-parties to the Indemnity Agreement, and that it made demand by informing Defendants Shulman, VIP, and Flash that it would retain the $296,615 "until set-off damages could be determined." (Pl.'s Resp. to Flash 10, ECF No. 203.) The Plaintiff further notes that the entry of default against Defendants Mega and Perfect establishes the elements of the Plaintiff's

claim against those defendants. *See Davis*, 321 F.3d at 648 ("[W]hen a judge orders a default entered, the factual allegations in the complaint are deemed to be admitted by the defendant."). Therefore, the Plaintiff's claim in Count I of the Amended Complaint for indemnification under the terms of the Indemnity Agreement is established as a matter of law against Defendants Mega and Perfect. (*See* Am. Compl. 5, ECF No. 7.) Defendant Flash replies that the Plaintiff was required to make demand upon an Indemnitor under the contract—here Defendants Shulman, Mega, or Perfect—and that merely announcing an intention to retain the funds did not constitute demand. The Court notes that the Indemnity Agreement says nothing about how demand is to be made as a condition precedent to an obligation for the Indemnitors to pay the Indemnitee. Further, the Indemnity Agreement gives the Plaintiff the right of offset "at its sole election." (Pl.'s Ex. 10.) Based on the facts in evidence, the Court finds that the Plaintiff's notification to Defendant Shulman that it would not release the $296,615 in its possession constituted demand for the purposes of the Indemnity Agreement. The Plaintiff made clear to Defendant Shulman that it would not release $296,615 of funds owing to Defendant Shulman under the vehicle purchase contracts. Nothing in the Indemnity Agreement indicates that the Plaintiff must make demand before deciding to exercise its right of offset. Accordingly, the Plaintiff's notification that it was retaining $296,615 constitutes a clear demand that the Indemnitors pay at least $296,615 before the Plaintiff would release the funds. Moreover, as the Plaintiff notes, the entry of default against Defendants Mega and Perfect establishes their liability under the Indemnity Agreement, and forecloses the issue of demand.

Defendants VIP and Flash next object that Defendant Shulman, as agent for Defendants Mega and Perfect, did not have the power to bind multiple parties to a single agreement. The

Defendants cite the Restatement (Second) of Agency, which states:

> Unless otherwise agreed between the principal and the agent, no one of two or more disclosed or partially disclosed principals, each of whom independently authorizes the same agent to make a contract, is liable upon a single contract made by the agent which combines the orders of the principals and calls for a single performance.

Restatement (Second) of Agency § 148. The Defendants admit that no Indiana court has adopted this provision, but urge the Court to adopt it under the reasoning of *Brunswick Leasing Corp. v. Wisconsin Central, Ltd.*, 136 F.3d 521 (7th Cir. 1998) (applying a provision of the Restatement (Second) of Agency to an Illinois case although no Illinois court had adopted that provision, because the Seventh Circuit concluded that an Illinois court would adopt the provision). The Plaintiff responds that § 148 is not the law in Indiana, and is not applicable because the Indemnity Agreement does not seek to bind multiple principals to a single contract. As an initial matter, the Court disagrees with the Plaintiff's assertion that the Indemnity Agreement would not bind multiple principals to a single contract. On the contrary, it states that the Indemnitors are liable "jointly and severally" to pay the Indemnitor in the event of export. (Pl.'s Ex. 10 ¶ 1.) However, the Court finds that it need not reach the issue of whether an Indiana court would adopt § 148 of the Restatement (Second) of Agency. Defendants VIP and Flash are arguing that the Indemnity Agreement is not valid as to Defendants Mega and Perfect because Defendant Shulman did not have the power to bind them to a single contract. But as discussed above, entry of default against Defendants Mega and Perfect has already established their liability to the Plaintiff under the terms of the Indemnity Agreement. Accordingly, arguments about the liability of defaulted defendants under the Indemnity Agreement are moot.

Finally, Defendant Flash argues that the $145,710 it advanced to the Plaintiff on April 17, 2008, cannot have been paid pursuant to two contracts between the Plaintiff and Defendant

34

Mega or Perfect because the purchase documents for these two vehicle sales are unsigned and list Defendant Shulman as the buyer instead of Defendants Mega or Perfect.[9] As to Defendant Shulman being listed as the buyer, the Court finds that this would make no difference under the Indemnity Agreement because Defendant Shulman is also listed as an Indemnitor, so export of a vehicle that he purchased from the Plaintiff would have the same effect on the funds advanced by Defendants VIP and Flash as would export of a vehicle purchased in the name of Defendants Mega or Perfect. As to signatures on the purchase documents, the Court has already found that the Plaintiff's business practice was not uniform. The Plaintiff's failure to complete every section of the documents, however, does not change the reality that the $145,710 wired by Defendant Flash was paid pursuant to contracts to purchase the two vehicles listed in Flash Exhibit A at Flash 27–28. The purchase documents for these two vehicles, both dated April 17, 2008, reflect a total price of $145,710, and that is exactly the amount that Defendant Flash wired into the Plaintiff's account on April 18, 2008. Defendant Flash is incorrect to state that there was no contract for the purchase of these vehicles. Accordingly, application of the offset provision of the Indemnity Agreement justifies the Plaintiff's retention of these funds.

For all the reasons discussed above, the Indemnity Agreement's offset provision justifies the Plaintiff's retention of the funds wired into its account by Defendants VIP and Flash from April 14–18, 2008.

---

[9]Defendant Flash also attempts to argue that the purchase agreement for one of these two transactions is dated May 2, 2008. (*See* ECF No. 7-6 at 22.) The Court notes that the VIN for the vehicle listed in ECF No. 7-6 at 22 is the same as the VIN for the vehicle referenced at Defendant Flash's Ex. A at Flash 27, but the form Defendant Flash refers to as the buyer order appears to be the same form Defendant Flash refers to as the purchase agreement at ECF No. 7-6 at 22.

**F.    The Plaintiff's Claim for Declaratory Judgment**

Count II of the Plaintiff's Amended Complaint against Defendants VIP and Flash seeks relief in the form of a declaratory judgment. The Indiana Declaratory Judgment Act states in relevant part as follows:

> Any person interested under a . . . written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder.

Ind. Code § 34-14-1-2. "The declaratory judgment statute's stated purpose is 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations,' and it 'is to be liberally construed and administered.'" *Quiring v. GEICO Gen. Ins. Co.*, 953 N.E.2d 119, 125–26 (Ind. Ct. App. 2011) (quoting Ind. Code § 34-14-1-12). However, a declaratory judgment is not appropriate where a party seeks such judgment "relating to whether its past conduct was performed in good faith," or in other words "to preemptively defend against a claim." *Mid-Century Ins. Co. v. Estate of Morris*, — N.E.2d —, No. 07A01-1106-PL-313, 2012 WL 1118228, at *7–8 (Ind. Ct. App. Apr. 4, 2012).

Because it appears the Plaintiff filed this request for a declaratory judgment to remove uncertainty and to inform its future actions with respect to the purchase agreements and the Indemnity Agreement, the Court will enter a declaratory judgment in favor of the Plaintiff and against Defendants VIP and Flash on Count II of the Amended Complaint.


**G.    Counterclaims for Common Law Conversion and Criminal Conversion**

Defendants VIP and Flash bring counterclaims alleging that the Plaintiff's conduct

amounts to conversion, thus entitling them to treble damages, attorney fees, and costs pursuant to the Indiana Crime Victim Relief Act (CVRA), Ind. Code § 34-24-3-1 *et seq.* The CVRA permits a person who has suffered pecuniary loss to bring a civil action if the loss was the "result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, or IC 35-45-9." Ind. Code § 34-24-3-1. Included among these criminal statutes is liability for criminal conversion under Ind. Code 35-43-4-3(a). To prevail on a CVRA claim for criminal conversion in Indiana, a party must show that a person "knowingly or intentionally exert[ed] unauthorized control over the property of another person." Ind. Code § 35-43-4-3(a).

> A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so. A person's control over property of another person is 'unauthorized' if it is exerted in a manner or to an extent other than that to which the other person has consented.

*French-Tex Cleaners, Inc. v. Cafaro Co.,* 893 N.E.2d 1156, 1166 (Ind. Ct. App. 2008) (quotation marks and citations omitted). A party must prove each of the elements of conversion by a preponderance of the evidence. *Id.* Additionally, "[i]n any criminal conversion action, criminal intent is an essential element that must be proven. . . . It is this *mens rea* requirement that differentiates criminal conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not intended to cover." *Id.* at 1166–67. Finally, a party that "proves the elements of criminal conversion by a preponderance of the evidence can recover the costs of the action, reasonable attorney's fees, and up to three times the actual damages. *Newland Resources, LLC v. Branham Corp.*, 918 N.E.2d 763, 775 (Ind. Ct. App. 2009).

However, the *mens rea* element of the criminal conversion statute, Ind. Code § 35-43-4-

3, is not an element of tortious conversion. *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1058 (S.D. Ind. 2011); *Catellier v. Depco, Inc.,* 696 N.E.2d 75, 78 (Ind. Ct. App. 1998). "To prove [tortious] conversion, a plaintiff must demonstrate that the defendant 'exert[ed] unauthorized control over property of another[.]'" *Meridian*, 763 F. Supp. 2d at 1058 (quoting Ind. Code § 35-43-4-3). Like all civil claims, tortious conversion "must be proven by a preponderance of the evidence." *Id.*

Defendants VIP and Flash assert that the Plaintiff committed both tortious (common law) conversion and criminal conversion by retaining the $296,615 wired into its account from April 14–18, 2008. The Plaintiff responds that it did not commit any form of conversion because it was authorized to retain the funds under the Indemnity Agreement. Further, the Plaintiff argues it did not meet the *mens rea* element of criminal conversion because it filed a lawsuit for declaratory judgment in order to expeditiously resolve the matter of the $296,615. The Plaintiff notes that it filed the lawsuit for declaratory judgment within three weeks of receiving notice that vehicles had been exported.

For the reasons discussed above, the Indemnity Agreement and purchase agreements authorized the Plaintiff's retention of the funds at issue. Because both tortious and criminal conversion require the Plaintiff to exercise unauthorized control over property of another, the claims for both of these torts will be denied. Furthermore, because the Plaintiff could not have been aware of a high probability that it was exercising unauthorized control over the property of another, the Plaintiff's control of the funds was not knowing as defined by the statute, so the Plaintiff's conduct could not meet the *mens rea* element required to show criminal conversion. The claims for criminal conversion will also be denied on this basis.

## H.    Damages Issue

"Liquidated damages provisions are generally enforceable where the nature of the agreement is such that when a breach occurs the resulting damages would be uncertain and difficult to ascertain. However, to be enforceable the stipulated sum must fairly be allowed as compensation for the breach." *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1077 (Ind. Ct. App. 2003) (quotation marks and citation omitted).

The evidence presented was that the damages to the Plaintiff as a result of the export of vehicles consisted of a flat fee of $250–$300, plus 5% of the retail sale price in the country to which the vehicle was exported, plus a reduction in inventory available to the Plaintiff for retail sale. As a result, because neither the final destination, nor the actual retail price to be charged, nor the inventory impact could have been known to the parties on the date on which the purchase agreements were executed, it was impossible for the Plaintiff to calculate the actual loss from a vehicle export.

Defendants VIP and Flash have not objected to the Plaintiff's assertion that $7,500 per vehicle exported was a reasonable liquidated damages provision. Given the evidence before the Court that the Plaintiff has been required to pay at least $3,000 and up to $11,000 per individual vehicle exported, the Court finds that $7,500 was a reasonable liquidated damages estimate of potential losses to the Plaintiff upon export of a vehicle. Forty-one of the vehicles purchased by Defendants Mega and Perfect were exported. Pursuant to the terms of the purchase agreements and the Indemnity Agreement, the Plaintiff is entitled to liquidated damages in the amount of

$7,500 per vehicle exported—$307,500 in total.[10] The Plaintiff is entitled, therefore, to offset that amount against amounts held by the Plaintiff.

The Plaintiff also requests costs and attorney fees incurred in this matter, but the Plaintiff has shown no basis upon which costs or attorney fees would be appropriate. As all parties have agreed, Defendants VIP and Flash are not parties to the Indemnity Agreement. The parties previously agreed to take up the topic of attorney fees at a subsequent hearing, and accordingly, the Court will set this matter for a telephonic conference.

## CONCLUSION

For the reasons stated above, the Court GRANTS declaratory judgment in favor of the Plaintiff. The Court DECLARES that under the contracts at issue, the Plaintiff is entitled to retain the $295,615 wired into its account by Defendants VIP and Flash from April 14–18, 2008. Furthermore, the Court DENIES the counter-claims for tortious conversion and criminal conversion brought by Defendants VIP and Flash. The Court SETS this matter for a telephonic status conference on September 13, 2012, at 10 AM before Judge Theresa L. Springmann. The Court will initiate the call. The Court WITHHOLDS entry of any final judgment in this matter until the time of said conference, where appropriate.

SO ORDERED on August 1, 2012.

  s/ Theresa L. Springmann
  THERESA L. SPRINGMANN

---

[10]The Court makes this finding only for the purposes of its conclusion that the liquidated damages provision of the Indemnity Agreement was reasonable. Because no party has requested entry of a default judgment, the Court is not entering judgment against Defendants Mega and Perfect at this time. *See* Fed. R. Civ. P. 55(b).

UNITED STATES DISTRICT COURT